UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DANIELLE MARKOU,

|  |  |
|---|---|
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SYSTEMAX, INC., RICHARD LEEDS, Chairman and CEO (and in his individual capacity) and LAWRENCE P. REINHOLD, Executive Vice-President and Chief Financial Officer (and in his individual capacity), | Docket No. 14-CV-7509 (SJF)(ARL) |
| Defendants, | |

-----------------------------------------------------------------x

Plaintiff Danielle Markou[1] ("Plaintiff"), by and through her attorneys, Valli Kane & Vagnini LLP, hereby alleges violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) *et seq.* ("Equal Pay Act"), New York State Labor Law § 190 *et seq.* and § 200 *et seq.* ("NYS Labor Law"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"), New York State Human Rights Law, N.Y. Executive Law §290 *et seq.* ("NYSHRL"), the Consumer Product Safety Improvement Act, 15 U.S.C. § 2051 *et seq.* ("CPSIA"), and the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX") as against Systemax, Inc. ("Systemax"), Richard Leeds ("Leeds") and Lawrence P. Reinhold ("Reinhold")(collectively known as "Defendants").

## INTRODUCTION

---

[1] Ms. Markou's maiden name of Lenzi was used in the caption and throughout the initial complaint. Moving forward, she prefers to proceed with her married name and thus, that is what is utilized herein.

1

1.     This is an action brought by Plaintiff challenging acts of discrimination and retaliation committed by Defendants against Plaintiff.

2.     Plaintiff seeks injunctive and declaratory relief, compensatory damages, liquidated damages, punitive damages, attorneys' fees and costs, and other appropriate legal and equitable relief pursuant to the Equal Pay Act, NYS Labor Law, Title VII, PDA, NYSHRL, SOX and CPSIA.

## JURISDICTION AND VENUE

3.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, pursuant to 29 U.S.C. § 206(d) under the Equal Pay Act, 42 U.S.C. § 2000e *et seq.* under Title VII and the Pregnancy Discrimination Act, 18 U.S.C. § 1514A under SOX, and 15 U.S.C. § 2051 *et seq.* under CPSIA, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; (iii) under 29 U.S.C. § 201 et. seq.

4.     The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367 (a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this Court pursuant to 29 U.S.C. §§ 201-219, in as much as this judicial district lies in a State in which the unlawful employment practices occurred.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendants maintain offices, conduct business and reside in this district.

## ADMINISTRATIVE REQUIREMENTS

6.      Plaintiff filed a verified complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about October 9, 2013.

7.      The EEOC issued a Notice of a Right to Sue Letter to Plaintiff dated June 25, 2015 which was received by Plaintiff on June 29, 2015.  Accordingly, Plaintiff's 90 day Right-to-Sue period, which is counted from the date of receipt, ends on September 27, 2015.

8.      Plaintiff also filed a complaint with the Department of Labor, Occupational Safety & Health Administration ("DOL") on or about August 27, 2013.

9.      Plaintiff has requested that the DOL release jurisdiction over the OSHA claim.

10.      Plaintiff will serve a copy of this Second Amended Complaint upon the Attorney General of the State of New York pursuant to NYLL § 215-2.

## PARTIES

11.      Plaintiff Danielle Markou ("Plaintiff"), is a person who has been aggrieved by Defendants' actions.  She is a former employee of Defendants who resides in Suffolk County, New York.

12.      At all relevant times herein, Plaintiff was an "employee" within the meaning of the Equal Pay Act, NYLL, Title VII and the Pregnancy Discrimination Act, NYSHRL, SOX and CPSIA.

13.      Defendant Systemax, Inc. ("Systemax") is a Delaware corporation registered and existing in the State of New York, maintaining its headquarters at 11 Harbor Park Drive, Port

Washington, New York 11050.

14.     Upon information and belief, Systemax is an employer within the meaning of the Equal Pay Act, NYLL, Title VII and the Pregnancy Discrimination Act, NYSHRL, SOX and CPSIA.

15.     Upon information and belief, Defendant Richard Leeds ("Leeds") resides in Florida.  Defendant Leeds is the Chairman and Chief Executive Officer of Systemax.

16.     Upon information and belief, Defendant Lawrence P. Reinhold ("Reinhold") is a citizen of New York and resides in Jericho, New York.  Defendant Reinhold is the Executive Vice-President and Chief Financial Officer of Systemax.

17.     Each Defendant is an employer within the meaning of the Equal Pay Act which employs the same definitions as under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §203(d).

18.     Each Defendant is an employer within the meaning of §190(3) of the New York Labor Law.

19.     Each Defendant is an employer within the meaning of 42 U.S.C. § 2000e(b) under Title VII and the Pregnancy Discrimination Act.

20.     Each Defendant is an employer within the meaning of N.Y. Executive Law §292(5) of the NYSHRL.

21.     Each Defendant is an employer within the meaning of 18 U.S.C. § 1514A under SOX.

22.     Each Defendant is an employer within the meaning of the 15 U.S.C. § 2087 under

4

the CPSIA.

23.     The Defendants all jointly employed Plaintiff.

## STATEMENT OF FACTS

24.     Plaintiff Danielle Markou began her employment at Systemax starting in February 2008.

25.     Systemax is a business that retails and private labels certain consumer electronics and industrial products.

26.     As a result of her exceptional performance, in January 2011, Ms. Markou was promoted to be the Vice President of Risk Management.

27.     Ms. Markou became the only female member of the company's Executive Management Team.

28.     Ms. Markou headed the Defendants' Risk Management department which covered the areas of product compliance, safety and OSHA compliance worldwide, an insurance portfolio of over ½ billion dollars in limits, insurance losses, and private label vetting.

29.     During her tenure at Systemax, Ms. Markou reported to Defendant Reinhold until she was demoted in April 2013.

30.     As head of one of Defendants' corporate departments, Ms. Markou's duties included the following: managing the operations of the department, managing the department budget, creating and following company policies and guidelines, managing staff, establishing goals and objectives for the department, exercising supervisory and decision making authority, and presenting and reporting to the Board of Directors.

31.     In 2012, Ms. Markou became concerned regarding the company's ability to meet legal and compliance requirements in the areas of global safety, product compliance, and risk management.

32.     Ms. Markou was concerned because other similar corporate departments headed by her male peers did not suffer from comparable shortages in staffing or resource allocation.

33.     In contrast to the inadequate staffing and resources in risk management and product compliance under Ms. Markou, other departments which were headed by male executive peers had dedicated international staff and global counsel, which were not provided to Ms. Markou.

34.     During this time, Ms. Markou realized that Defendants were not interested in hiring a Product Compliance Manager or in assigning resources to her department to ensure a thorough review of customer complaints.

35.     Mr. Leeds refused to hire a Product Compliance Manager for Ms. Markou's department, despite the fact that other departments headed by male peers increased in staff size or were already robust in size.

36.     When Ms. Markou inquired of CEO Richard Leeds about hiring a Product Compliance Manager, Mr. Leeds yelled at her that "if I get a product compliance person, I'm going to get more recalls."

37.     On another occasion, Ms. Markou while reviewing customer service logs, noticed an increasing number of consumer complaints about electrical devices emitting "popping" noises which could indicate a hazard and a safety concern.

38.     After Ms. Markou attempted to show the customer service logs to Mr. Leeds, Mr. Leeds shoved the logs in Ms. Markou's face and yelled, "I told you that 'popping' is not a product failure" notwithstanding the fact that "popping" can lead to electrical fires in products.

39.     On another occasion, Ms. Markou complained about the company's product compliance failures to Mr. Reinhold to which Ms. Mr. Reinhold responded by stating that it was up to the Leeds (Richard, Robert and Bruce) to "decide if they wanted hire someone for compliance and to follow product compliance laws."

40.     Ms. Markou responded that following federal law is not a choice it is mandatory.

41.     Mr. Reinhold then stated, "[L]isten, it's the Leeds' company and if they want to assume the risk of not following CPSC ("Consumer Product Safety Commission") laws, then that is for them to decide."

42.     Ms. Markou again responded by stating that it was not accurate to state that the Leeds could decide not to follow federal law, and that just as other federal law had to be followed so did the CPSC.

43.     Upon information and belief, Systemax failed to disclose its inadequate resource allocation on global safety, product compliance and risk management to its shareholders or Board of Directors.

44.     Upon information and belief, at no point, did CEO Richard Leeds or CFO Lawrence Reinhold disclose these concerns in the company's quarterly or annual reports, both of which are filed with the Securities and Exchange Commission (SEC) nor were such issues addressed in any of its press releases.

45.     By not disclosing the inadequate resource allocation on global safety, product compliance, and risk management issues, the company was misrepresenting the extent of the company's potential liabilities and also misrepresenting possible violations of consumer product safety laws.

46.     Consequently, this failure to disclose served to defraud Systemax's shareholders, Board of Directors, and the SEC.

47.     Ms. Markou was further subjected to gender discrimination in the form of sexually explicit comments by Mr. Reinhold, who was Ms. Markou's direct supervisor.  Mr. Reinhold routinely discussed his sexual experiences, including sexually explicit comments about oral sex. Mr. Reinhold also asked Ms. Markou whether she ever "texted [her] private parts to anyone."  He frequently commented on body parts and the bodies of female employees and commented about a particular former employee that, without her face, she had a great body and that he would "do" her."

48.     Mr. Reinhold routinely questioned Ms. Markou about her personal life such as whether she was married, had a boyfriend, and whether she was pregnant.  He would ask her if she wanted "kids" and told her that he enjoyed his kids "like any hobby, but they weren't something he couldn't live without."

49.     Ms. Markou performed at an exceptionally high level which was documented in her performance reviews.  Her work resulted in the company's recoupment of over $20 million from various insurance companies.

50.     However, as Vice President and head of Risk Management, Ms. Markou was compensated less than similarly situated male individuals who headed other corporate departments such as Ben White, Tom Axmacher, Bob Baker, Curt Rush and Alan Schaeffer.

51.     At the time of Ms. Markou's termination, her base annual salary was approximately $ 191,000.00.

52.     Ms. Markou's educational background included completion of a Bachelor of Arts, Bachelor of Science, a Juris Doctor, and a Master of Laws (LLM).

53.     During the relevant time period, Ben White was Defendants' Vice President of Audit.

54.     Mr. White's responsibilities during this time included managing the operations of the Audit department, managing the department budget, creating and following company policies and guidelines, managing staff, establishing goals and objectives for the department, exercising supervisory and decision making authority, and presenting and reporting to the Board of Directors.

55.     Upon information and belief, during the relevant time period, Mr. White's base annual salary was approximately $ 262,000.00.

56.     Upon information and belief, Mr. White's educational background included completion of a Bachelor of Science and a Master of Business Administration.

57.     During the relevant time period, Tom Axmacher was Defendants' Vice President and Controller.

58.     Mr. Axmacher's responsibilities during this time included managing the operations of the Accounting department, managing the department budget, creating and following company policies and guidelines, managing staff, establishing goals and objectives for the department,

exercising supervisory and decision making authority, and presenting and reporting to the Board of Directors.

59.     Upon information and belief, during the relevant time period, Mr. Axmacher's base annual salary was approximately $ 308,000.00.

60.     Upon information and belief, Mr. Axmacher's educational background included completion of a Bachelor of Science and a Master of Business Administration.

61.     During the relevant time period, Bob Baker was the Defendants' International Controller.

62.     Mr. Baker's responsibilities during this time included managing the operations of the Overseas Accounting department, managing the department budget, creating and following company policies and guidelines, managing staff, establishing goals and objectives for the department, exercising supervisory and decision making authority, and presenting and reporting to the Board of Directors.

63.     Upon information and belief, during the relevant time period, Mr. Baker's base annual salary was approximately $ 255,000.00.

64.     Upon information and belief, Mr. Baker's educational background included completion of a Bachelor's degree.

65.     During the relevant time period, Curt Rush was General Counsel and then, deputy General Counsel.

66.     Mr. Rush's responsibilities during this time included managing the operations of the Legal department, managing the department budget, creating and following company policies

and guidelines, managing staff, establishing goals and objectives for the department, exercising supervisory and decision making authority, and presenting and reporting to the Board of Directors.

67.    Upon information and belief, during the relevant time period, Mr. Rush's base annual salary was approximately $ 251,200.00.

68.    Upon information and belief, Mr. Rush's educational background included completion of a Bachelor of Arts and a Juris Doctor.

69.    During the relevant time period, Alan Schaeffer was Director of Facilities.

70.    Mr. Schaeffer's responsibilities during this time included managing the operations of the Physical Facilities department, managing the department budget, creating and following company policies and guidelines, managing staff, establishing goals and objectives for the department, and exercising supervisory and decision making authority.

71.    Upon information and belief, during the relevant time period, Mr. Schaeffer's base annual salary was approximately $ 288,000.00.

72.    Upon information and belief, Mr. Schaeffer's educational background included completion of a Bachelor's Degree.

73.    Upon information and belief, Ms. Markou suffered lower pay and other forms of compensation including but not limited to bonuses, stock options, and car allowances as compared to Ben White, Tom Axmacher, Bob Baker, Curt Rush and Alan Schaeffer on the basis of her gender.

74.    Like her male counterparts, Ms. Markou was the highest ranking employee and subject matter expert in her department as Mr. White, Mr. Axmacher, Mr. Baker, Mr. Rush and Mr. Schaeffer were in their respective departments.

11

75.     In having the same and equal responsibilities as described above, Ms. Markou shared the same and equal common core of tasks that Mr. White, Mr. Axmacher, Mr. Baker, Mr. Rush and Mr. Schaeffer had.

76.     As a result, Ms. Markou exercised equal skill and equal effort in her duties as Mr. White, Mr. Axmacher, Mr. Baker, Mr. Rush and Mr. Schaeffer did in their duties.

77.     Like her male counterparts Mr. White, Mr. Axmacher, Mr. Baker, and Mr. Rush, Ms. Markou reported to Defendant Lawrence P. Reinhold.

78.     Like her male counterparts Mr. White, Mr. Axmacher, Mr. Baker, and Mr. Rush, Ms. Markou worked in the Defendants' Port Washington, New York office.

79.     Like her male counterparts Mr. White, Mr. Axmacher, Mr. Baker, and Mr. Rush, Ms. Markou was evaluated annually with the same performance grid.

80.     Like her male counterparts Mr. White, Mr. Axmacher, Mr. Baker, and Mr. Rush, Ms. Markou was subject to the same monthly reporting deadline grid.

81.     Like her male counterparts Mr. White, Mr. Axmacher, Mr. Baker, and Mr. Rush, Ms. Markou was responsible for managing, implementing, and creating corporate approval guidelines.

82.     Like her male counterparts Mr. White, Mr. Axmacher, Mr. Baker, and Mr. Rush, Ms. Markou was a member of the Defendants' Disclosure Committee reviewing and analyzing public documents.

83.     Therefore, Ms. Markou performed her duties under similar working conditions as her male counterparts.

84.     Upon information and belief, Ms. Markou suffered lower pay and other forms of compensation than other similarly situated male Vice Presidents and/or executives on Defendants' management team even though she performed equal work requiring equal skill, effort and responsibility and did so under similar working conditions.

85.     In January 2013, Ms. Markou complained to Mr. Reinhold that her compensation was not commensurate to that of her executive peer group who were all males.

86.     Specifically, in a series of emails to Mr. Reinhold in January 2013, Ms. Markou stated that "I am frankly disappointed by the numbers and feel that I should… be compensated relative to my peers" and she went on to add that she believed that her achievements put her on par with her peer group on the management team and that her pay should therefore be commensurate.

87.     Ms. Markou also complained that she was the only parent company Vice President who was not an "Executive Officer" while the other parent company Vice Presidents who were all males were afforded that title.  Reinhold belittled Ms. Markou informing her that Risk Managers could not be Executive Officers and intimated that she was obtuse for even thinking she warranted Executive Officer status.

88.     In January 2013, Mr. Reinhold responded that he would address the monetary concerns with Ms. Markou, but never did.

89.     Also in March 2013, Systemax's Global Safety Manager, Robert Wagner, left the company which resulted in all of the global safety and product compliance responsibilities of a worldwide Fortune 1000 company to be performed by Ms. Markou.  At this point, Ms. Markou

decided to formally document her concerns about global safety, product compliance and risk management to Systemax CEO Richard Leeds.

90.     On or about March 29, 2013, Ms. Markou wrote an email to Mr. Leeds about the company's failure to meet product compliance requirements because there was no Global Safety Manager nor a Product Compliance Manager.  Specifically, Ms. Markou stated that "product compliance was bare" meaning that there was no dedicated employee with product compliance expertise.  At March/April 2013 Board Meeting the board decided that they would eliminate the open product compliance position and not provide the resources needed for product compliance. Following the Board Meeting Richard Leeds directed that "legal and risk management are out of product compliance." The company's failure to address these areas made it susceptible to violations under the CPSIA.

91.     In her March 29, 2013 complaint, Ms. Markou also complained that there was no worldwide resource allocated for Risk Management.

92.     In making these complaints, Ms. Markou put the company and Mr. Leeds, who is intimately familiar with reporting requirements, on notice that such concerns about failures to meet product compliance requirements and adequately allocate resources for product compliance and risk management were required to be disclosed to the shareholders and the Board of Directors, and in the company's quarterly and annual reports as required by SOX.

93.     In her March 29, 2013 email, Ms. Markou further complained to Mr. Leeds that she was being paid less than her similarly situated male peers on the Executive Management Team and that she was unjustifiably being denied the "Executive Officer" status that had been given to her male executive counterparts.

94.     In her March 29, 2013 complaint, Ms. Markou identified the following similarly situated male peers who were compensated more than she: Ben White, Tom Axmacher, and Curt Rush.

95.     Specifically, in her March 29, 2013 complaint, Ms. Markou wrote to Mr. Leeds: "I have mentioned my concerns, but do not believe they are being adequately addressed.  Relative to my peer group as an executive, I would like to be an "Executive Officer" under the SEC and paid similar to my peers in NY – Tom [Axmacher], Ben [White], Curt [Rush], etc.  I do not think this is an unrealistic expectation.  I was told Heads of Risk Management cannot be "EOs" which actually isn't true.  More than the title, I would like my pay to be more comparable." Even General Counsel Eric Lerner ("Mr. Lerner") thought Markou was in an EO position when he asked her to execute SEC documentation.

96.     Also in her March 29, 2013 complaint, Ms. Markou stated that her department was inadequately staffed and resourced relative to the departments headed by her male peers.

97.     As a result of her March 29, 2013 complaints, Ms. Markou was subjected to retaliation.

98.     On or about April 9, 2013, in response and in retaliation for Ms. Markou's complaints, Defendants demoted Ms. Markou and subjected her to strict and specific restrictions regarding her work hours to which her male executive peers were not subject including but not limited to being directed to use vacation time for medical appointments.  Mr. Reinold directed that anytime she left the building, even to get a cup of coffee down the road, she was to use PTO (paid time off) or vacation time.

99.     On April 9, 2013, Mr. Reinhold communicated these decisions personally to Ms. Markou in a meeting.  During the meeting, Mr. Reinhold threatened, harassed and spoke abusively to Ms. Markou for sending the March 29, 2013 email and he indicated that her job was in jeopardy. Specifically, during the meeting, Mr. Reinhold yelled at Ms. Markou, "It was so fucking inappropriate that you went over my head.  If I didn't have the weekend to think about it, you wouldn't be sitting here."  These retaliatory actions were documented in Mr. Reinhold's email of the same date to Ms. Markou.

100.    Before Ms. Markou was demoted, she reported directly to CFO Mr. Lawrence Reinhold. However, in retaliation to Ms. Markou's complaints, Defendants demoted Ms. Markou, requiring her to report to Mr. Lerner, who was Ms. Markou's peer and had minimal knowledge about product compliance, global safety, and risk management issues.

101.    On or about April 10, 2013, Ms. Markou requested permission to leave for a doctor's appointment and a dentist appointment. Mr. Reinhold responded that she "[s]ubmit p[aid] t[ime] o[ff] requests" which was a procedure her male Vice President peers were not subject to for medical appointments.

102.    Ms. Markou discussed the double standard regarding time off with Mr. Lerner and he indicated that he would speak with Larry (Reinhold) about the disparity.

103.    On or about May 13, 2013, Ms. Markou notified Mr. Lerner and upon information and belief Lerner informed Mr. Reinhold that she was pregnant.

104.    On or around February of 2013, Ms. Markou began making preparations for the Risk and Insurance Management Society ("RIMS") Conference which was being held in the Los Angeles area from Sunday, April 21, 2013 to Wednesday, April 24, 2013.

105.    On February 14, 2013, Ms. Markou's initial itinerary for the RIMS Conference was directly reviewed and personally approved by Mr. Reinhold through the company's Concur system, which required an employee to submit a travel itinerary for review and approval by the appropriate supervisor, and the purpose of which is to make business expenses transparent and require company review and approval prior to the actual expenses.

106.    In March 2013, Ms. Markou started reaching out to other brokers, underwriters and carriers to try and meet before and during the conference.   Accordingly, Ms. Markou rescheduled her arrival time to Burbank to be late Friday night, April 19, 2013 which would lead to her reaching her hotel about midnight April 19, 2013.

107.    The rescheduled itinerary was directly reviewed and personally approved by Mr. Reinhold through the company's Concur system.

108.    At a previous RIMS Conference, Ms. Markou had similarly arrived one day prior to the start date to meet with brokers, underwriters and carriers. Previously, Systemax had no objections and covered the additional day's expenses.  As a result, the additional days' expenses prior to the conference were within the acceptable "ordinary, necessary and reasonable travel, entertainment and other expenses incurred during the conduct of business" for which Systemax reimbursed employees.

109.    Consequently, Mr. Reinhold expressed no objection to and explicitly approved Ms. Markou's itinerary and expense request twice before Ms. Markou's trip.

110.    When Ms. Markou returned from the RIMS Conference, she submitted her request for trip reimbursement to Defendants.

111.    On or about May 21-May 22, 2013, in response to Mr. Reinhold's questions about expenses incurred before the April 21, 2013 start date of the RIMS conference, Ms. Markou indicated that she attempted to meet with other brokers, underwriters and carriers.

112.    In response, Mr. Reinhold dismissed Ms. Markou's statements as "BS" and directed Ms. Markou to "adjust the report."

113.    While she did not agree with the decision, nonetheless, on May 30, 2013, Ms. Markou complied and adjusted the report to allocate one day less taxes, fees and parking as personal ($ 298.00), and the other day as business.

114.    However, on May 31, 2013, through Concur's Status Change Update, Mr. Reinhold still rejected Ms. Markou's revised report's calculations as "not correct."

115.    Mr. Reinhold believed that Ms. Markou was responsible for $ 783.22 for the two full days of hotel charges and rental car usage notwithstanding the fact that Ms. Markou arrived late Friday night/early Saturday morning and the conference started on Sunday afternoon.

116.    On the same date, Ms. Markou requested her then-supervisor General Counsel Mr. Lerner's guidance in dealing with the reimbursement request.  Mr. Lerner expressed no initial objection to Ms. Markou's reimbursement request.

117.    Despite Ms. Markou's providing the evidence Mr. Reinhold requested of her attempts to schedule appointments, and despite Ms. Markou's willingness to pay for one of the two weekend days as a personal expense leaving only $ 485.22 at dispute, Mr. Reinhold proceeded to submit the matter to Internal Audit for investigation.

118.    On or about June 10, 2013, Ms. Markou reminded Mr. Lerner and Mr. Reinhold that she was pregnant and had been pregnant during the business trip at issue.

119.   Defendants' retaliation of Ms. Markou continued when she was subjected to the purported internal audit of personal expenses listed on her business expense report from the RIMS Conference trip.

120.   Defendants subjected Ms. Markou to the internal audit even though Mr. Reinhold had, on two prior occasions, directly and personally approved Ms. Markou's trip itinerary prior to Ms. Markou's March 29, 2013 complaint.

121.   Nevertheless, Ms. Markou agreed to personally pay the disputed expenses.

122.   Despite Ms. Markou's agreement to pay the disputed expenses, on June 19, 2013 and June 20, 2013, Defendants continued to retaliate against Ms. Markou by subjecting her to a prolonged interrogation, during which she was not free to leave.  At the conclusion of interrogation, Ms. Markou was told to resign.

123.   Ms. Markou refused to resign, and on June 21, 2013, Defendants continued their retaliation against her by placing her on administrative leave.

124.   On June 24, 2013, Ms. Markou complained to Systemax's Human Resources via email that the Defendants' actions were "retaliatory in nature and occasioned by my good faith actions, including my recent advice that I am pregnant and will need to take child care leave."

125.   In the same June 24, 2013 email, Ms. Markou also stated to Systemax's Human Resources that "I need to work, and I need health care coverage in view of my high-risk pregnancy, all of which I am more than willing to discuss with you.  I hope Systemax does the right thing."

126.   On June 26, 2013, Ms. Markou was wrongfully terminated on the basis of her pregnancy and gender and in retaliation for her complaints about the company's inadequate resource allocation to the global safety, product compliance and risk management departments

19

which she headed, and also for her complaints about being discriminated against by being paid less than her male peers on the Executive Management team, and having her department under resourced relative to departments headed by her male peers.

127.    Throughout her period of employment, including her tenure as Vice President, Ms. Markou's work performance was exceptional, and exceeded the performance of her similarly situated male executive peers.

128.    Yet as Vice President, Ms. Markou was discriminated against in the terms and conditions of her employment as she received less compensation then her male executive peers, including but not limited to a lower salary, smaller bonus amounts as well as other forms of compensation.

129.    When Ms. Markou complained about 1) being paid less than her similarly situated male executive peers, 2) her department being inadequately resourced relative to her male executive peers, 3) Defendants' failure to meet product compliance requirements because there was no Global Safety Manager or a Product Compliance Manager, 4) the Defendants' failure to have any worldwide resource allocated for Risk Management which put Defendants on notice that such concerns were required to be disclosed to the shareholders and the Board of Directors, and in the company's quarterly and annual reports as required by SOX, and 5) in response to the company being notified she was pregnant, she was subject to retaliation, including but not limited to demotion, being subject to strict restrictions on work hours and leave to which her male executive peers were not subject including but not limited to being directed to use vacation time anytime I left the office, being subject to an internal audit, being placed on administrative leave, and termination.

130.    Therefore, Ms. Markou's termination was a result of Systemax's sex and pregnancy discrimination and in retaliation for her complaints about inadequate resource allocation and unequal pay on the basis of sex, as well as complaining about Systemax's failure to address product compliance, global safety and risk management concerns.

## AND AS FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS
### (Pay Discrimination - Equal Pay Act, 29 U.S.C. § 206(d))

131.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

132.    Defendants discriminated against Plaintiff within the meaning of the Equal Pay Act by providing her with lower pay and other forms of compensation than similarly situated male colleagues on the basis of her gender even though Plaintiff performed equal work requiring equal skill, effort and responsibility as her similarly situated male colleagues.

133.    Plaintiff and similarly situated male employees all performed equal job duties and functions as Vice Presidents and/or members of the company's Executive Management Team.

134.    Plaintiff and similarly situated male colleagues all performed equal work that required equal skill, effort, and responsibility, and that was performed under similar working conditions.

135.    Defendants discriminated against Plaintiff by subjecting her to discriminatory pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and/or titles, and other forms of discrimination in compensation in violation of the Equal Pay Act.

136.    The differential in pay between Plaintiff and her male colleagues was not due to seniority, merit, quantity or quality of production, or a factor other than sex.  Rather, the differential in pay was due to Plaintiff's gender.

137.    Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender in violation of the Equal Pay Act.

138.    Defendants' actions were not done in good faith nor did they have any reasonable grounds for believing that their acts or omissions were not a violation of the law.

139.    As a result, Plaintiff is entitled to liquidated damages in addition to lost wages and lost earning capacity.

140.    Defendants' foregoing conduct also constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a).  Because Defendants have willfully violated the Equal Pay Act, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255(a).

141.    As a result, Plaintiff has suffered and continues to suffer damages and harm, including but not limited to lost wages and lost earning capacity.

## AND AS FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS
### (Retaliation – Equal Pay Act, 29 U.S.C. § 215(a))

142.    Plaintiff repeats and realleges the allegations contained in paragraphs above, as if fully set forth herein.

143.    In January 2013 and on or about March 29, 2013, Plaintiff complained to Defendants about their failure to pay her equal wages.

144.     In response, Defendants retaliated against Plaintiff by subjecting her to demotion, strict restrictions on work hours and leave to which her male executive peers were not subject including but not limited to being directed to use vacation time for medical appointments, an internal audit, being placed on administrative leave, and termination.

145.     As a result, Plaintiff has suffered and continues to suffer damages and harm, including but not limited to lost wages, lost earning capacity, and emotional distress.

## AND AS FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS
### (Pay Discrimination – New York State Equal Pay Act, New York Labor Law § 194)

146.     Plaintiff repeats and realleges the allegations contained in paragraphs above, as if fully set forth herein.

147.     Plaintiff makes this claim under the New York State Equal Pay Act, NYLL §§ 194 *et seq.*

148.     Defendants subjected Plaintiff to a discriminatory lower rate of pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and/or titles, and other forms of discrimination relative to Plaintiff's similarly situated male colleagues.

149.     Plaintiff and similarly situated male colleagues all performed equal work that required equal skill, effort, and responsibility, and that was performed under similar working conditions.

150.     Defendants' actions were not done in good faith.

151.     As a result, Plaintiff is entitled to liquidated damages in addition to lost wages and lost earning capacity.

152.    As a result, Plaintiff has suffered and continues to suffer damages and harm, including but not limited to lost wages and lost earning capacity.

## AND AS FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS

### (Retaliation – New York Labor Law § 215)

153.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

154.    Plaintiff made a complaint within the meaning and scope of Section 215 of the New York Labor Law when she complained in January 2013 and on or about March 29, 2013 to Defendants about her wages.

155.    In response, Defendants retaliated against Plaintiff by subjecting her to demotion, strict restrictions on work hours and leave to which her male executive peers were not subject including but not limited to being directed to use vacation time for medical appointments, an internal audit, being placed on administrative leave, and termination.

156.    As a result, Plaintiff has suffered and continues to suffer damages and harm, including but not limited to lost wages, lost earning capacity, and emotional distress.

## AND AS FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT SYSTEMAX, INC.

### (Discrimination – Title VII of the Civil Rights Act of 1964 and the Pregnancy Discrimination Act)

157.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

158.    Plaintiff was subjected to discrimination based on sex and pregnancy by Systemax.

159.    Due to her gender and/or pregnancy, Defendants subjected Plaintiff to a discriminatory lower rate of pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and/or titles, demotion, strict restrictions on work hours and leave, including but not limited to being directed to use vacation time for medical appointments, an internal audit, being placed on administrative leave, and termination to which her male executive peers were not subject

160.    These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended, and the Pregnancy Discrimination Act.

161.    As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects. Plaintiff has also been damaged by having lost wages and benefits due to her discriminatory termination.

## AND AS FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANT SYSTEMAX, INC.

**(Retaliation – Title VII of the Civil Rights Act of 1964 and the Pregnancy Discrimination Act)**

162.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

163.    Plaintiff was subjected to retaliation for her complaints about sex and pregnancy discrimination by Systemax.

164.    These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended, and the Pregnancy Discrimination Act.

165.     In retaliation for her complaints about Defendants subjecting her to different terms and conditions of employment as compared to her male, non-pregnant co-workers, Plaintiff was subjected to a discriminatory lower rate of pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and/or titles, demotion, strict restrictions on work hours and leave, including but not limited to being directed to use vacation time for medical appointments, an internal audit, being placed on administrative leave, and termination to which her male executive peers were not subject.

166.     As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects. Plaintiff has also been damaged by having lost wages and benefits due to her retaliatory termination.

### AND AS FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANT SYSTEMAX, INC.

**(Discrimination and Retaliation – NYSHRL)**

167.     Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

168.     Plaintiff was subjected to discrimination based on her sex and pregnancy and subject to retaliation for her complaints about sex and pregnancy discrimination.

169.     Due to her gender and/or pregnancy and/or in retaliation for her complaints about Defendants subjecting her to different terms and conditions of employment as compared to her male, non-pregnant co-workers, Defendants subjected Plaintiff to a discriminatory lower rate of pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and/or titles, demotion, strict restrictions on work hours and leave, including but not

limited to being directed to use vacation time for medical appointments, an internal audit, being placed on administrative leave, and termination to which her male executive peers were not subject

170.    These actions are in direct violation of the New York State Human Rights Law, Executive Law § 290 *et. seq*.

171.    As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects. Plaintiff has also been damaged by having lost wages and benefits due to her discriminatory and retaliatory termination.

## AND AS FOR A EIGHTH CAUSE OF ACTION AGAINST DEFENDANT RICHARD LEEDS

### (Aiding and Abetting Discrimination and Retaliation – NYSHRL)

172.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

173.    Defendant Richard Leeds aided and abetted Defendant Systemax in its discriminatory actions against Plaintiff based on Plaintiff's sex and pregnancy, and aided and abetted Defendant Systemax in its retaliatory actions against Plaintiff for her complaints about sex and pregnancy discrimination.

174.    These actions are in direct violation of the New York State Human Rights Law, Executive Law § 290 *et. seq*.

175.    As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects.

Plaintiff has also been damaged by having lost wages and benefits due to her discriminatory and retaliatory termination.

## AND AS FOR A NINTH CAUSE OF ACTION AGAINST DEFENDANT LAWRENCE P. REINHOLD

### (Aiding and Abetting Discrimination and Retaliation – NYSHRL)

176.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

177.    Defendant Lawrence P. Reinhold aided and abetted Defendant Systemax in its discriminatory actions against Plaintiff based on Plaintiff's sex and pregnancy, and aided and abetted Defendant Systemax in its retaliatory actions against Plaintiff for her complaints about sex and pregnancy discrimination.

178.    These actions are in direct violation of the New York State Human Rights Law, Executive Law § 290 *et. seq.*

179.    As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects. Plaintiff has also been damaged by having lost wages and benefits due to her discriminatory and retaliatory termination.

## AND AS FOR A TENTH CAUSE OF ACTION AGAINST DEFENDANTS

### (Retaliation – CPSIA)

180.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

181.    Plaintiff was subjected to retaliation for her complaints about Defendants' failures to meet product compliance requirements and to adequately allocate resources to the Defendants' product compliance and global safety functions.

182.    These actions are in direct violation of Consumer Product Safety Improvement Act.

183.    As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects. Plaintiff has also been damaged by having lost wages and benefits due to her retaliatory termination.

### AND AS FOR A ELEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
### (Retaliation– SOX)

184.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

185.    Plaintiff was subjected to retaliation for her complaints about Defendants' failures to meet product compliance requirements and adequately allocate resources for product compliance and risk management which were required to be disclosed to Systemax's shareholders and the Board of Directors, and in the company's quarterly and annual reports as required by SOX.

186.    These actions are in direct violation of Sarbanes-Oxley Act.

187.    As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects. Plaintiff has also been damaged by having lost wages and benefits due to her retaliatory termination.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendants and the following relief as follows:

1.      A jury trial on these issues to determine liability and damages;

2.      Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3.      A judgment declaring that the practices complained of herein are unlawful and in violation of Equal Pay Act, 29 U.S.C. § 206(d) and 29 U.S.C. § 215(a), and New York State Labor Law § 194 and § 215, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), New York State Human Rights Law, N.Y. Executive Law §290 *et seq.* ("NYSHRL"), the Consumer Product Safety Improvement Act, 15 U.S.C. § 2051 *et seq.* ("CPSIA"), and the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX").

4.      An award to the Plaintiff for the amount of unpaid wages, including interest thereon, and penalties subject to proof;

5.      An award of liquidated damages pursuant to the FLSA, 29 U.S.C. § 216, NYLL §§ 198 and 663 and any other applicable statute, rule, or regulation, including the rules or regulations of the New York Commissioner of Labor.

6.      All damages which Plaintiff sustained as a result of Defendants' conduct, including back pay, front pay, general and special damages for lost compensation and job benefits they would have received but for Defendants' improper practices;

7.      An award to Plaintiff of compensatory damages, including but not limited to damages for emotional pain and suffering;

8.      An award to Plaintiff of pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action on all unpaid wages from the date such wages were earned and due;

9.      An award of punitive damages;

10.      Awarding Plaintiff her costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

11.      Post-judgment interest, as provided by law; and

12.      Granting Plaintiff other and further relief as this Court finds necessary and proper.


Dated:           September 22, 2015
                 Garden City, New York

                                  Respectfully Submitted,

                                  VALLI KANE & VAGNINI LLP

                                  */s/ Robert J. Valli, Jr.*_____
                                  ROBERT J. VALLI, JR.
                                  *Attorneys for Plaintiff*
                                  600 Old Country Road, Suite 519
                                  Garden City, New York 11530
                                  516-203-7180

31