UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
DANIELLE LENZI,

                          Plaintiff,

          -against-

SYSTEMAX, INC., RICHARD LEEDS,
Chairman and CEO (and in his individual
capacity), and LAWRENCE P. REINHOLD,
Executive Vice-President and Chief Financial
Officer (and in his individual capacity),

                          Defendants.
----------------------------------------------------------X

FEUERSTEIN, J.

**FILED**
**CLERK**

1:22 pm, Mar 09, 2018

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**OPINION AND ORDER**
14-CV-7509 (SJF)(ARL)

I.     Introduction

          Presently before the Court is a motion for summary judgment pursuant to Federal Rule of

Civil Procedure 56, filed by defendants Systemax, Inc. ("Systemax" or the "Company"), Richard

Leeds ("Leeds"), and Lawrence P. Reinhold ("Reinhold") (collectively, "Defendants") seeking

the dismissal of the surviving claims brought by plaintiff Danielle Markou (née Lenzi)[1]

("Plaintiff") in her Second Amended Complaint ("SAC") (hereafter, the "Summary Judgment

Motion").  (*See* ECF No. 59.)  Plaintiff opposes the Summary Judgment Motion.  (*See* ECF No.

59-11; hereafter, the "Opposition".)  For the following reasons, the Summary Judgment Motion

is GRANTED.

---

[1] Although the docket still reflects Plaintiff's name as Danielle Lenzi, in her Second Amended
Complaint ("SAC") (ECF No. 25) and all submissions thereafter, Plaintiff captions herself
Danielle Markou, her married name.  (*See* SAC at n.1 ("Ms. Markou's maiden name of Lenzi
was used in the caption and throughout the initial complaint.  Moving forward, she prefers to
proceed with her married name and thus, that is what is utilized herein.").)

II.    Background

   *A.  Generally*

   The facts herein are taken from the parties' statements and counter-statements pursuant

to Local Civil Rule 56.1, declarations, and accompanying exhibits, and are undisputed unless

otherwise noted.  (*See generally* Defendants' Statement of Uncontested Facts Pursuant to Rule

56.1 of the Local Civil Rules ("Def. 56.1 Stmt.") (ECF No. 58); Plaintiff's Counterstatement of

Material Facts Pursuant to Rule 56.1 of the Local Civil Rules ("Pl. 56.1 Stmt.") (ECF No. 59-6);

Defendants' Reply and Response to Plaintiff's Counterstatement of Material Facts Pursuant to

Rule 56.1 of the Local Civil Rules ("Def. 56.1 Reply") (ECF No. 59-12); Declaration of Mark S.

Mancher in Support of Defendants' Motion for Summary Judgment ("Mancher Decl.") (ECF

No. 59-1); Declaration of Matthew L. Berman in Opposition to Defendants' Motion for

Summary Judgment ("Berman Decl.") (ECF No. 59-7); and Supplemental Declaration of Mark

S. Mancher in Further Support of Defendants' Motion for Summary Judgment ("Mancher Reply

Decl.") (ECF No. 59-13)).  Where the same fact is asserted or admitted by both Plaintiff and

Defendants, only one source is cited.  Citations to paragraphs within Plaintiff's Rule 56.1

Counterstatements or Defendants' Reply to the Counterstatements reflect both the original

statements and the opposing party's responses, as well as the supporting exhibits cited thereto.

   The Court has considered whether the parties' statement of facts are supported by

admissible evidence.  If a statement of fact is premised entirely upon inadmissible evidence, it is

disregarded.  If a proffered fact that is supported by admissible evidence is disputed only with

inadmissible or irrelevant evidence, the Court treats that fact as undisputed.  *See, e.g., Spiegel v.

Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that . . . the district court in

awarding summary judgment[] may rely only on admissible evidence.") (internal citations and

quotations omitted); *Scotto v. Brady*, 410 F. App'x 355, 361 (2d Cir. 2010) ("We observe that a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence, and that the principles governing admissibility of evidence do not change on a motion for summary judgment.") (internal quotations and citations omitted); *see also Burlington Coat Factory Warehouse Corp. v. Espirit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (ruling a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment"). Where a statement of fact is controverted with a legal argument rather than a factual statement, the Court disregards the argumentative objection and treats the underlying fact as admitted. *See, e.g., Amalgamated Lithographers of Am. v. Unz & Co. Inc.*, 670 F. Supp.2d 214, 217 (S.D.N.Y. 2009).

B. *The Parties*

1. The Defendants, Generally

Systemax, a publicly traded company with more than 5,000 employees in North America and Europe, sells "products featured in dozens of catalogs and websites." (Def. 56.1 Stmt. ¶18.) During Plaintiff's employment, Leeds was the Chief Executive Officer ("CEO") of Systemax; he is currently its Chairman of the Board of Directors. (*See id.* ¶19.) During Plaintiff's employment, Reinhold was Systemax's Chief Financial Officer; now he is the CEO. (*See id.* ¶20.)

2. Plaintiff Danielle Lenzi, Generally

Plaintiff has four post-secondary degrees: (1) a Bachelor of Art degree in business administration from Michigan State University; (2) a Bachelor of Science degree in education from Michigan State University; (3) a Juris Doctorate from the University of Connecticut School of Law; and (4) a Latin Legum Magister in insurance law from the University of

Connecticut School of Law. (*See* Pl. 56.1 Stmt. ¶135.) Prior to joining Systemax, Plaintiff was a department head and director of risk management for Liberty Mutual Insurance Company ("Liberty"), a Fortune 100 company, in its Boston office and earning an annual salary of one hundred ten thousand dollars ($110,000). (*See id.; see also* Def. Stmt. ¶25.)

On January 21, 2008, Systemax offered Plaintiff the position of Director of Risk Management in its Long Island headquarters, with an annual base salary of one hundred forty thousand dollars ($140,000) plus a target performance bonus of twenty percent (20%) of her base salary. (*See* Def. Stmt. ¶21.) As it did with Bob Baker, Tom Axmacher, and Alan Schaeffer, three Systemax employees that Plaintiff identifies as comparators, Systemax utilized industry "benchmarking" data to set Plaintiff's starting salary. (*See* Pl. 56.1 Stmt. ¶22.) Plaintiff accepted the position without negotiating her starting salary and began working for Systemax on February 4, 2008, reporting directly to Reinhold. (*See* Def. 56.1 Stmt. ¶¶23, 24, 27.) In addition to her base salary, Plaintiff received a thirty-three thousand dollar ($33,000) bonus in 2008. (*See id.* ¶ 26.) On January 1, 2011, Plaintiff was promoted to Vice President of Risk Management and received a base salary increase from one hundred forty-eight thousand, five hundred twelve dollars ($148,512) to one hundred fifty-five thousand dollars ($155,000). (*See id.* ¶¶ 28, 29.)

*C. Plaintiff's Complaints*

1. The 2011 Compensation Discussions and Pay Increase

On March 28, 2011, about three months after her promotion to Vice President of Risk Management, Plaintiff met with Reinhold and requested a pay increase. (Def. 56.1 Reply ¶¶ 30-32.) During this meeting, Plaintiff testified she expressed concern that she "wasn't paid relative to [her] peers." (Def. 56.1 Stmt. ¶ 31.) Plaintiff classified her "peers" as "the other parent company vice presidents that also reported to Reinhold," including Ben White, who Plaintiff

described as a "very comparable peer," and the other four or five executives on the "Disclosure Committee," all of whom were male.  (Pl.'s Depo. Tr. at 109-10.)  Plaintiff testified variously that when speaking with Reinhold: "I believe I used the term male, too"; "I believe it is correct that I used males"; and "I did use it [the word "males"] from time to time and I did say my peers." (*Id.* at 112, 114.)  After her meeting with Reinhold, Plaintiff spoke with Leeds, then the CEO, about her compensation.  (Def. 56.1 Stmt. ¶ 33.)  Following her meeting with Leeds, Systemax increased Plaintiff's annual base salary from one hundred fifty-five thousand dollars ($155,000) to one hundred seventy-five thousand dollars ($175,000) effective August 15, 2011. (*See id.* ¶ 34.)

### 2.  The 2013 Complaints

#### (a.)  Regarding Compensation

Plaintiff testified that her December 2012 bonus "was the lowest of [her] career and [she] had some concerns over whether or not [Systemax] [was] taking notice of [her] performance and some of the achievements that [she] and the [Risk Management] department made." (*Id.* ¶38.) These concerns prompted Plaintiff to send her January 4, 2013 email to Reinhold, presenting a variety of achievements she and her Risk Management team had accomplished since her joining Systemax, and concluding that she"hope[d] that my achievements put me on par *with my peer group* on the management team and that my pay is commensurate." (*Id.* ¶37 (emphasis added).) On January 26, 2013, Plaintiff forwarded the same January 4th email to Reinhold, referencing a "meeting on Monday" and stating that she was "disappointed by the numbers and fe[lt] that [she] should get [her] full target bonus and be compensated *relative to her peers*." (*Id.* ¶39 (emphasis added).)

On an unspecified date soon after January 26, 2013, Plaintiff and Reinhold met to discuss her compensation. (*See id.* ¶41.) Reinhold told Plaintiff that she was the only one of his direct reports that earned more money in 2012 than in 2011, which Plaintiff contends is inaccurate. (*See* Pl. 56.1 Stmt. ¶41.) On February 21, 2013, Plaintiff sent Reinhold another email regarding compensation, writing, *inter alia*: "Also, I ran my numbers for my compensation for the last few years. []In regards to your mentioning at our meeting that I was the only one that made more money this year than prior years. I am not sure what figures you were reviewing but in fact, as I suggested, it was the lowest payout for bonus of all 5 years at [Systemax] and I made less last year." (Def. 56.1 Stmt. ¶43.)

*(b.) Regarding Product Safety Coverage and Related Issues*

Robert Wagner, who reported to Plaintiff, was a safety manager tasked with both employee safety and product safety, which included, *inter alia*, managing customer service complaint logs "to help prevent product issues before they show[ed] a negative trend (thereby potentially requiring a recall)." (*See* Ex. 36[2] (ECF No. 59-10) at 102; *see also id.* at 101-03).) In an October 2012 email to Reinhold regarding Wagner's position and, in particular, product safety, Plaintiff wrote, *inter alia*:

> *After the CPSC* [*i.e.*, Consumer Protection Safety Commission] *amended the former CPSC statute and began greater enforcement . . . it's a changed world in the product space. PL products are held to an even higher standard. Without [Wagner],* <u>*we could go bare*</u> *or require an operational individual to self manage this exposure. Also, various coverage lines expected to have a designated point person for safety and product issues (per our disclosures during the UW* [*i.e.*, underwriting] *process). This would need to be mitigated and discussed with carriers. The*

---

[2] Numerically identified exhibits are those of Plaintiff and are attached to the Berman Declaration (ECF No. 59-7). Hereafter, they will be cited "Ex. [#]". Alphabetically identified exhibits are those of Defendants and are attached to the Mancher Declaration (ECF No. 59-1). Hereafter, they will be cited "Ex. [letter(s)]". When necessary for clarification and where available, Bates stamp numbering will be included in the relevant exhibit citation.

> *Product Recall carrier would likely not renew with us without a*
> *program in place and a point person to address recall issues and*
> *product complaints as they come in.*

(Ex. 36 at 103 (italicized emphasis in original, underlined emphasis added).)

In early March 2013, Wagner gave notice that he was leaving Systemax. (*See* Def. 56.1 Stmt. ¶¶44-46.) On March 8, 2013, Plaintiff emailed Reinhold, seeking permission to hire a temporary replacement for Wagner and to contact an attorney Plaintiff knew regarding a new "product position." (*Id.* ¶¶47, 48.) Reinhold gave Plaintiff permission to hire a temporary replacement for Wagner, but questioned Plaintiff's desire to contact the attorney for a "product position," as it did not "look like she [was] a safety person", and Wagner alone had handled both employee and product safety issues. (*Id.* ¶ 49.) However, notwithstanding his reservations about hiring two people to cover employee and product safety, Reinhold wrote: "If you feel strongly that [Systemax] need[s] a full time safety person and a full time compliance lawyer then go ahead and have the conversation with [Leeds]. If he agrees, then that is the direction to go." (*Id.*). Ultimately, Plaintiff hired a replacement for Wagner, but not someone to fill a separate "product position." (Pl. 56.1 Stmt. ¶50.) Plaintiff contends that she was unable to hire two people because she

> was not allotted budgetary resources sufficient to hire personnel
> for the 'safety' and 'product' positions as the amounts she was
> budgeted were less than for prior searches to fill these positions,
> which had resulted in a failure as a result of the salaries authorized
> by Mr. Reinhold being too low to attract qualified candidates.

(*Id.*)

On March 29, 2013, Plaintiff sent an email to Leeds (hereafter, the "March 29th Email") stating that she was "not happy with recent developments" and setting forth four areas of

dissatisfaction, entitled: "Tools/Resources"; "Risk Management Budget"; "Compensation"[3]; and

"No Worldwide Resource." (Def. 56.1 Stmt. ¶53; *see also* Ex. Q (the March 29th Email).)

Under "Tools/Resources", Plaintiff wrote, *inter alia*:

- As of this email, there isn't any product compliance since there is no one to man the function after Bob Wagner left the company.
  . . .
- I was advised first that Larry [Reinhold] would talk to Richard [Leeds] to get two needed headcount – one for safety and another for product compliance. When I followed up, I was told that it was decided that those were only two part time headcount. This can't be.

- . . . I received the good news about getting two new headcount – one for safety and the other for Product Compliance/CPSC, only I am given what seems to be an impossible hurdle of hiring each position for only $70K.

(Ex. Q.) Under "Compensation", Plaintiff wrote, *inter alia*:

- . . . It [compensation] is not where I would have hoped given some of the remarkable results I have been able to deliver the past 5-6 years.

- I have mentioned my concerns but do not believe they are being adequately addressed. Relative to my peer group as an executive, I would like to be an 'Executive Officer' under the SEC and paid similar to my peers in NY – Tom, Ben, Curt, etc. I do not think this is an unrealistic expectation. I was told that Heads of Risk Management cannot be 'EOs' which actually isn't true. More than the title, I would like my pay to be more comparable.

- This past year, after delivering a $5M policy limits settlement with our carrier, I was paid the lowest I have made in my career at Systemax and the bonus was the lowest in my career in running [risk management]

---

[3] Plaintiff's complaints under the "Risk Management Budget" section related to "Plaintiff's role managing [Systemax's] insurance portfolio and was unrelated to her request for additional staffing." (Def. 56.1 Stmt. ¶57). They are not relevant to Plaintiff's claims or the present motion.

departments.  This is even more difficult in a year where we are paying for a wedding and saving for a home.

(*Id.*)  Under the "No Worldwide Resource" heading, Plaintiff wrote, *inter alia*:

- I had asked for consideration/help regarding obtaining a worldwide resource for Risk Management.  My department is the only worldwide department without a worldwide resource.  Factually, other comparable departments, such as legal have grown from 1.5 attorneys 5 years ago to 9 now.  Worldwide, they have three dedicated full time attorneys.

- [Risk management] needs to place insurance, consult and manage losses/claims in Europe all without a headcount.  My concerns over this have not been addressed.  If I obtain a full time product compliance person, I can include this area as part of their function so that there is additional coverage.  I do believe we need help to have this area covered though.

(*Id.*)  Plaintiff concluded the March 29th Email: "As a risk management department with a small team of three, we have brought in over $20M to Systemax's bottom line and in fact this year alone, we have recouped already $1.5M with another $500K on the way, as such, I would like to continue these great results with adequate resources and for the right compensation.  *If other departments* weren't getting resources or pay, that might make it more understandable, but this is not the case."  (*Id.* (emphasis added).)  Plaintiff testified this was her "whistleblower letter to the Leeds" (Pl.'s Depo. Tr. at 185:17-18), which Leeds forwarded to Reinhold.

On April 9, 2013, Reinhold called Plaintiff to his office for a meeting regarding the March 29th Email.  Plaintiff asserts, but Defendants dispute, that (1) Reinhold admonished her for going over his head to Leeds with her complaints, and (2) intimated that, but for the intervening weekend between Reinhold receiving the forwarded March 29th Email and the April 9th meeting, Plaintiff would have already been fired.  (*See* Def. 56.1 Reply ¶214.)  Reinhold also informed Plaintiff, among other things, that her direct report was being changed to Eric Lerner

("Lerner"), head of the Company's Legal Department, and that any leave time she took was to be taken from her vacation time. (*See id.*) To memorialize what was discussed at the April 9th meeting, Reinhold sent Plaintiff a follow-up email later that day. (*See* Ex. 32 (hereafter, the "April 9th Email").) Among other things, Reinhold noted: his direct reports and "others who are essentially at [Plaintiff's] level, put in substantially more hours in the office than [Plaintiff]"; his expectation of a "10 hour workday in the office," with weekend access, via phone and/or email, to his direct reports; that Plaintiff is "not [to] leave the office during office hours for personal reasons," and that if Plaintiff "need[s] to be gone, [to] submit a request for PTO [(*i.e.*, personal time off)]; and that prospectively, Plaintiff "report[s] directly to [] Lerner on a solid line basis and to [Reinhold] on a dotted line basis." (*See id.*) Reinhold concluded the April 9th Email, "If you feel a need to have a substantive conversation or other communication with the Leeds or the outside directors, let Eric Lerner and me know in advance. This does not mean your direct access to them is limited with regard to whistleblower type matters." (*Id.*) Despite the change in Plaintiff's direct report, there was no change to her compensation. (*See* Lerner Depo. at Tr. 98:7-13.)

As far as Plaintiff was concerned, there continued to be non-coverage of product safety through mid-June 2013. After Wagner and another employee left, Plaintiff did not have access to product safety reports, which Lerner characterized as "a problem". (*See* Ex. 35 (ECF No. 59-10) at 96-98 (June 19, 2013 email chain between Plaintiff and Lerner).) However, he did not see this as a "resource issue', but a performance issue. (*See id.* at 97 ("If you're telling me as head of RM that you're unaware of product safety incidents or the reports/data bases that bring them to RM, one of your main functions, that's a bigger problem. . . . [D]on't make this a resources issue, which its [*sic*] not.").) Plaintiff responded that since Wagner's departure, she had been

advising Lerner that "product compliance [wa]s bare" and had "repeatedly asked for resources so we can have someone dedicated tracking this internally.  It is critical, which is why I raised it."

(*Id.*)  In reply, Lerner stated, *inter alia*:

> [Y]ou're telling me a basic aspect of your job isn't being done, and you don't understand why I won't accept that as an answer, or your efforts to deflect the work based on "resources".  *With Stan here and Rich before him, you have the same resources at hand as when [Wagner] was here.*  But you've let this function lapse.  Telling me about it is not "permission" not to do you job.  I've asked you repeatedly to address this.  Please do so.  Honestly Danielle, is it your position as head of RM that you dropped product safety reporting because you haven't figured out how to find a few hours a month to look at a report or access a data base that is essential to your function?

(*Id.* at 96-97 (emphasis added).)  Plaintiff responded, in part:

> We have been trying to piece together compliance without any resource after [Wagner] left. . . .  Product compliance . . . in [Wagner]'s absence has focused first on getting the vetting documents out and pushing that to the business, as you know.  On the incident side, I have raised this function also being bare multiple instances.  I know you and I personally discussed this and I sought your advice on how to proceed.  I too believe it is a problem that needs to be pieced together.  My concern is what happens after the CS logs are located?  Who will review, vet, analyze the incidents and help make a recall recommendation?  I am already swamped with repeated international issues (since we are the only department without an international resource).  RM is a team of three. . . .  I have advised product compliance has been bare since [Wagner]'s absence, which is why I continue to raise it, ask for support and resources.  I am not sure what else to do.  Of course, I am trying to also bring Stan up to spend [sic], but training doesn't happen overnight.

(*Id.* at 96.)

*D. Plaintiff's Role at Systemax and those of her Alleged Comparators*

   1. Plaintiff's Role as Head of Risk Management

According to the Company's job description for the Vice President of Risk Management, the person holding that position, who was Plaintiff, was responsible for seven bullet-pointed matters: designing, developing, implementing, administering, and renewing global risk management and insurance programs for the entire Company; directing activities of safety, engineering, and loss prevention experts; identifying and measuring the risk of financial loss through various means and in consultation with other personnel; developing and recommending methods of treating and reducing risk; preparing specifications for, negotiating, analyzing, and reviewing insurance coverage; designing, administering, and maintaining records and results of insured and self-insured programs; and establishing and maintaining relationships with global insurance brokers, underwriters and claims personnel. (Exh. 22 (Bates stamped "D000154"); *see also* Def. 56.1 Reply ¶137.) However, this job description did not capture all of Plaintiff's duties and responsibilities. (*See* Def. 56.1 Reply ¶¶138, 139; *see also* Pl.'s Depo. Tr. at 130:20-131:21.) Further, qualifications for the position included having a "[b]achelor's degree with a minimum of 10+ years progressive experience with proven knowledge of risk management," the ability to "interfac[e] with all levels of management," "the ability to work in a fast-paced and constantly changing environment," and "[b]e deadline driven and able to prioritize multiple tasks, handle heavy workloads, organize, analyze and interpret data." (Exh. 22 (delineating qualifications)(emphasis added).)

Like other department heads who were directors and vice presidents reporting directly to Reinhold, Plaintiff was a "subject matter expert[]." ((Pl.'s Depo Tr. (ECF No. 59-8) at 110:14-15, attached as Ex. 4 to Berman Decl.; *see also id.* at 110:6-14.) Plaintiff viewed her peers as

"Reinhold's other direct reports, which included, in addition to Ben White, it was Bob Baker and Curt Rush[,] and probably Tom Axmacher." (*Id.* at 111: 19-22; *see also id.* at 112:8-14 ("Q: . . . So when you are talking about reports, you are not talking about male/female; you are talking about people that reported – at that point the people you were looking at as comparators were people who reported to Larry Reinhold? A: Yes."); *cf., id.* at 112:22-25 ("A: . . . I would say I'm not paid comparable to the rest of the people in this row, you know, the men, you know, considering Curt Rush, Bob Baker."); *cf., id.* at 113:2-6 ("Q: So, in other words, you would look at the org chart and you would say I'm not being paid similar to what these other individuals are being paid; is that right? A: Yes, his [Reinhold's] other direct reports.").) Like other department heads, Plaintiff had the generic responsibilities of managing the operations, budget, and staff of her department, establishing goals and objectives for her department, creating and following company policies and guidelines, and exercising supervisory and decision-making authority. (*See id.* at 110:15-18; *see also* Def. 56.1 Reply ¶¶136, 142; Ex. II (White Decl.) ¶¶4, 7; Ex. KK (Axmacher Decl.) ¶¶5, 7; Ex. LL (Baker Decl.) ¶¶4, 6; Ex. MM (Rush Decl.) ¶¶ 4, 5; Ex. NN (Schaeffer Decl.) ¶¶4, 6.)

2. Comparator Benjamin White

White is the Vice President of Internal Audit (*see* Ex. II ¶¶2, 21-22), the head of the Internal Audit Department of the Company (*see* White Depo. Tr. (Ex. 9) at 25:16-20; 26:11-17), and reports to Reinhold (*see id.* at 25:10-13; *see also* Def. 56.1 Stmt. ¶27). He is a licensed certified public accountant with a dual undergraduate degree in finance and international business and a master's degree in business administration. (*See* Ex. II ¶9-11.) Since 1994, White has been employed as an auditor, working primarily at large accounting firms, before joining the Company in 2007. (*See id.* at ¶¶12-20.) In March 2010, Systemax's Board of

Directors appointed White to be the Company's Internal Auditor.  (*See id.* at ¶22.)  Broadly,

White's responsibilities and functions included managing the operations, budget, and staff of his

department, establishing goals and objectives for his department, creating and following

company policies and guidelines, and exercising supervisory and decision-making authority (*see*

*id.* at ¶¶7, 5); however, his core duties and responsibilities include:

> (1) issuing internal audit reports of the Company's business
> processes including, but not limited to, information technology,
> general ledger, accounts payable and accounts receivable; (2)
> preparing internal investigation reports; (3) conducting pre-
> implementation reviews of Systemax's business systems including,
> but not limited to, the general ledger, accounts payable inventory
> and accounts receivable; (4) auditing internal controls over
> Systemax's financial reporting (Sarbanes-Oxley Section 404); (5)
> overseeing compliance with the PCI Data Security Standard; (6)
> working with management to implement internal controls with
> Systemax's financial, operational and information technology
> processes and systems at various Systemax facilities within North
> America, Europe, India and China.

(*Id.* at ¶24.)  White "supervised approximately 60 employees" (*id.* at ¶26), of which four to five

reported directly to him (*see* White Depo. Tr. at 28:3-29:10).

The qualifications Systemax expected its Vice President of Internal Audit to possess

were, among others: possessing a bachelor's degree in accounting or financing, as well as a

"CPA Certification"; at least 10 to 12 years of related experience, including progressively more

responsible duties relating to audit, general accounting, and operations; a minimum of 2 years'

experience in a large, public accounting firm;"[s]trong knowledge of GAAP, GAAS, Sarbanes-

Oxley and COSO internal control framework"' and a willingness to travel thirty percent of the

time, both domestically and to Europe.  (Ex. 23 (Bates stamped "D000158").)  Plaintiff testified

she was not qualified to do White's job.  (*See* Pl.'s Depo. Tr. at 129:5-10 ("Q: You're not

qualified to perform [White's] job, isn't that right?  A: Correct.  Q: You could not perform his job, isn't that correct?  A: Correct.  And he couldn't perform mine.").)

       3.  Comparator Thomas Axmacher

Axmacher is the Vice President and Comptroller of Systemax (*see* Ex. KK (Axmacher Decl.) ¶2), as well as its Principal Accounting Officer (*id.* at ¶3).  Axmacher has an undergraduate degree in accounting (*see id.* at ¶9) and a master's degree in business administration (*see id.* at ¶10).  Since his 1982 graduation from college, Axmacher has held various accounting positions with publicly traded companies, with his last positions before joining Systemax being that of Executive Vice President for Finance, Chief Financial Officer, and Principal Accounting Officer of Curative Health Services of New York, Inc.  (*See id.* at ¶11-18.)  In September 2006, Axmacher joined Systemax and was assigned the principal responsibility of ensuring Systemax and its employees complied with rules and regulations promulgated by the Securities and Exchange Commission ("SEC").  (*See id.* at ¶¶19-20.)  Specifically, Axmacher's duties and responsibilities include:

> (1) ensuring accurate and timely filing of quarterly Form 10Q and annual Form 10-K reports to the SEC which provide a comprehensive dislcoure of Systemax's financial performance; (2) reviewing Systemax's domestic and international financial results, including profit, loss and balance sheets, for each of Systemax's business units to ensure compliance with internal policies, SEC rules and regulations and compliance with United States Generally Accepted Accounting Principles; (3) creating and charining Systemax's disclosure committee which reviews necessary disclosures to Systemax's shareholders; (4) authoring System's domestic and international accounting policies; (5) managing the financial reviews and audits of Systemax's financial results, both quarterly and annually, by the Company's external audit firm; (6) ensuring that the Company's worldwide subsidiaries are recording the correct tax provisions in the Company's financial statements and that worldwide tax returns are filed accurately and in a timely manner.

(*Id.* at ¶21.) Axmacher reported directly to Reinhold. (*See* Def. 56.1 Stmt. ¶27.)

The qualifications Systemax sought in its Chief Financial Officer included, among other things, was: a "[m]inimum of 5 years experience as an auditor with an international accounting firm working with multinational clients;" a minimum of five years' experience as a financial controller with full balance sheet and profit and loss responsibility "of a €500 million revenue business that is part of a US public reporting company;" "[d]irect experience with businesses operating in a minimum of 5 countries;" have a CPA certification and knowledge of "SAP FICO," a financial accounting module used to manage financial and business data in a unified system. (Ex. 23 (Bates stamped "D000155").) Plaintiff testified she had no way of knowing whether performing Axmacher's job was easier or harder than performing her own. (*See* Pl.'s Depo. Tr. at 124:16-21.)

### 4. Comparator Robert Baker

Baker is a 1979 graduate of the Wharton School of Business, graduating with a Bachelor of Science Degree in Economics, having majored in accounting. (*See* Ex. LL (Baker Decl.) ¶8.) He is a certified public accountant. (*See id.* at ¶9.) For approximately ten years after his graduation, Baker held various auditor positions with a large accounting firm, specializing in retail department store clients and advancing to the level of Senior Manager of Audit. (*See id.* at ¶10.) For the next approximate dozen years, Baker worked for Toys "R" Us, eventually being promoted to the position of Vice President of Finance for the International Division, in which he was "responsible for all financial operations in Canada, Europe, Middle East, Japan and Australia." (*Id.* at 13; *see also id.* at ¶¶11-12.) In 2002, Baker left Toys "R" Us, joining HRG North America, f/k/a SenGate Travel Group, as its Vice President of Finance and Administration, where he was responsible for Finance and Human Resources. (*See id.* at ¶14.)

In June 2008, Baker joined Systemax as its European Controller, thereby becoming primarily responsible for the Company's "financial and operational strategy and management" of its European interests (*see id.* at ¶¶15-16), which broadly included managing the operations, budge, and staff of his department, establishing goals and objectives for his department, creating and following company policies and guidelines, and exercising supervisory and decision-making authority (*see id.* at ¶¶6, 4). However, Baker's core duties and responsibilities as European Controller were "more specific" (*id.* at ¶6), including:

> (1) managing the finances of Systemax's European business units;
> (2) complying with each European country-specific statutory
> financial filings and directing audits of the local business with
> external auditors; (3) all accounts payable to European vendors;
> (4) all accounts receivables from Europan customers; (5)
> responsible for credit assessment of all customers in Europe; (6)
> directly involved in the decision to open, relocate or close
> operations within Europe; (7) significant (35%-45%) international
> travel to Europe to supervise Systemax's operations; (8) creating
> and managing a budget for every business unit in Europe; and (9)
> monthly, quarterly and annual financial close of the books for each
> business unit in Europe and apprising corporate headquarters and
> the Board of Directors of the financial health of Systemax's
> European business; (1) managing all cash movements in Europe;
> (11) serving as a key member of the European Executive
> Leadership Team which establishes strategy across Europe; and
> (12) involvement in the planning and establishment of the
> [C]ompany's [s]hared service center in Hungary which required
> moving 150 finance positions from Western Europe to Budapest.

(*Id.* at ¶17.) Additionally, Baker was to "work[] with the Systemax corporate risk management office to minimize business risk," and "ensur[e] continual review and maintenance of European insurance provisions as directed by Systemax corporate risk management." (Ex. 23 (Bates stamped "D000161").) Baker reported directly to Reinhold. (*See* Def. 56.1 Stmt. ¶27.)

Similar to the qualifications for Systemax's Chief Financial Officer, the Company wanted, among other things, the following qualifications in its European Controller: five years'

minimum experience with a "Big4/8 [accounting] firm" of which three of those years was working with multinational clients; "[d]irect experience with businesses operating in a minimum of 5 countries;" at least ten years' experience as a controller of a domestic public company or division of a company; a minimum of seven years' experience as a financial controller with full balance sheet and profit and loss responsibility "of a €500 million revenue business that is part of a US public reporting company;" be a certified CPA; and have experience with direct marketing and distribution. (Ex. 23.)

In her deposition, Plaintiff testified that she and Baker "didn't do the same job, but we did similar work." (Pl.'s Depo Tr. at 122:23-24; *see also id.* at 123:24-124:2 (Plaintiff acknowledging she could not "step in and do [Baker's] job . . . [a]nd he couldn't step in and do [her] job."); 122:25-123:5 ("Q: You did different jobs and you can't say whether his job is easier or harder than your job, can you? A: I don't know but we operate at the same level as the department heads."); 123:19-23 (Q: . . . [Y]ou have no way to judge the extent or the amount of specialized knowledge [Baker] has versus what you have, isn't that right? A: Correct."); 124:14 ("We [*i.e.*, Plaintiff and Baker] have different knowledge.").)

### 5. Comparator Curt Rush

Rush is a former Systemax employee, having been its General Counsel, and later its Deputy General Counsel/Chief Litigation Counsel. (*See* Ex. MM (Rush Decl.) ¶2.) He was a philosophy major, graduating with a Bachelor of Arts degree in 1981 (*see id.* at ¶6), and then receiving a Juris Doctorate degree in 1984 (*see id.* at ¶7). Rush was admitted to the New York State bar in 1985. (*See id.* at ¶8.) For approximately six years, through 1991, Rush worked in private practice. (*See id.* at ¶9.) For the approximate next six years, he was in-house counsel for two different companies. (*See id.* at ¶¶10-11.) From October 1996 through May 2012, Rush

"was employed by Systemax as its General Counsel and Secretary," and "[f]rom May 2012

through March 2015, [he] served as Systemax's Deputy General Counsel/Chief Litigation

Counsel." (*Id.* at ¶¶12-13.)

As General Counsel, Rush "worked on diverse legal matters affecting Systemax's

business including, but not limited to, contract, employment, real estate, mergers and

acquisitions, intellectual property and litigation matters." (*Id.* at ¶14.) While acknowledging

managing the operations, budge, and staff of his department, establishing goals and objectives

for his department, creating and following company policies and guidelines, and exercising

supervisory and decision-making authority were part of his broad responsibilities and functions

(*see id.* at ¶¶5, 4), Rush's more particular core duties and responsibilities included:

> (1) establishing Systemax's legal department; (2) participating in
> the establishment of company policies and procedures; (3)
> participating in the negotiation and drafting of material contracts
> on behalf of Systemax and its subsidiaries; participating in the
> negotiation and completion of several significant transactions
> including the acquisition of both private and publicly held
> technology companies in North America and Europe; (5)
> participating in the negotiation of loan agreements on behalf of
> Systemax and its subsidiaries;[4] (7) participating in the
> negotiation and drafting of intellectual property licensing
> agreements on behalf of Systemax and its subsidiaries; and (8)
> managing outside counsel with respect to company litigation
> matters.

(*Id.* at ¶15; *see aslo* Ex. 23 (Bates stamped "D000160") (including "Risk Mgt." as a key

responsibility).) Rush initially reported to Reinhold (*see* Pl.'s Depo. Tr. at 111:19-22), but later

reported to Lerner, who replaced Rush as Corporate Counsel and head of the Company's Legal

Department (*see* Def. 56.1 Stmt. ¶27).

---

[4] There was no sixth item listed in paragraph 15 of the Rush Declaration.

6. Comparator Alan Schaeffer

Schaeffer is Systemax's Director of Facilities. (*See* Ex. NN (Schaeffer Decl.) ¶2.) He has a Bachelor of Science degree in chemical engineering, which was conferred in January 1984. (*See id.* at ¶8.) On January 2, 1984, Schaeffer began working for the Company, first as a project engineer, then, after five years, as a sales manager selling technical and engineered systems. (*See id.* at ¶¶9-10.) In 1994, Schaeffer was promoted to his present position, making him responsible for the design and management of Systemax's facilities domestically and abroad. (*See id.* at ¶¶11-12.) Schaeffer's core duties and responsibilities include:

> (1) working with local real estate brokers to tour and secure property for new construction or lease on behalf of Systemax for commercial use; (2) negotiating purchase and lease agreements; (3) preparing preliminary designs and specifications for the construction and/or planning of Systemax facilities; (4) engaging contractors, architects and engineers for commercial construction projects; (5) analyzing areas of project redundancies with respect to Systemax's commercial construction projects; and (6) engaging in significant domestic and international travel.

(*Id.* at ¶13.) "[S]ince becoming Director of Facilities, [Schaeffer] ha[s] designed most facilities utilized by Systemax that [are] located in the United States and in Europe" (*id.* at ¶14), and is "intimately familiar with Systemax's commercial constructions with respect to both design and implementations." (*Id.* at ¶16.) While Schaeffer acknowledges his department head position also entails managing the operations, budget, and staff of his department, establishing goals and objectives for his department, creating and following company policies and guidelines, and exercising supervisory and decision-making authority, "those responsibilities and functions only comprise 5% of [his] job responsibilities as the Director of Facilities." (*Id.* at ¶6; *see also id.* at ¶4.) Plaintiff testified she could not have done Schaeffer's job. (*See* Pl.'s Depo. Tr. at 128:9-11.)

*E. Plaintiff's Trip to Los Angeles and Subsequent Events*

1. Pre-planning for the Trip

On February 14, 2013, Plaintiff received approval from Reinhold to take a business trip to Los Angeles, California to attend a conference run by the Risk and Insurance Management Society ("RIMS"). While her initial itinerary had her flying to California on a Saturday, Plaintiff revised her travel plans to leave a day earlier, securing a "last flight available" for the earlier flight. (Ex. 37 (Bates stamped "D000401")(noted in "Description" line of document).) Plaintiff contends Reinhold approved that revision as well. (*See* Pl. 56.1 Stmt.¶200; Def. 56.1 Reply 56.1 Stmt.¶200.) Plaintiff testified that the reason for changing her itinerary was to provide her with an additional day to meet with business colleagues. (*See* Pl. Depo. Tr. at 292:20-294:5.) When she was unable to secure any meetings, she did not change her flight back to leave at a later date. (*See id.* at 294:6-295:17.)

The RIMS conference was scheduled to commence on Sunday, April 21, 2013, beginning with registration in the afternoon. (*See* Ex. S (ECF No. 59-3 at 38).) On Monday, Tuesday, and the first half of part of Wednesday, there were various sessions for RIMS conference participants to attend, with continuing legal education credits ("CLEs") available to session attendees. (*See id.* at 38-39; *see also* Ex. 39 ("Instructions for Tracking and Obtaining Continuing Education Credits") (ECF No. 59-10 at 120-29).) The conference concluded early Wednesday afternoon with a presentation by comedian Howie Mendel, for which no CLEs were available. (*See* Ex. S at 39; *see also* Ex. 39 at 126-27.)

2. The Trip

Plaintiff flew to California on Friday, April 19, 2013, arriving somewhere between midnight Friday night and early Saturday morning. (*See* Defs.' Reply 56.1 Stmt. at ¶ 201.)

None of her attempts to set up meetings prior to the conference's commencement came to fruition.  (*See* Pl.'s Depo. Tr. at 294:2-4; *see also* Ex. U (ECF No. 59-3 at 49-50).)  Plaintiff attended RIMS CLE sessions on Monday, April 22, 2013, Tuesday, April 23, 2013, and the morning of Wednesday, April 24, 2013.  She did not attend the two-hour luncheon or the "Conference Finale", which was scheduled from 2:15 pm to 3:45 p.m.  (*See, e.g.,* Ex. S at 2.) She flew back to New York Wednesday evening.  (*See, e.g.*, Ex. 38.)

3.  Reinhold's Subsequent Scrutiny of the Trip

On May 20, 2013, Plaintiff submitted an expense report for the RIMS conference.  (*See* Ex. Y (ECF No. 59-3 at 76).)  On May 21, 2013, Reinhold sent Plaintiff an e-mail regarding the expense report, asking her to "revise expense rpt to allocate hotel and rental car charges between personal (2 days) and business as RIMS did not start until Sunday night," and questioning other expenses on the report.  (Ex. U at 50.)  This began an extensive exchange of emails with Plaintiff first responding:

> Initially, I was going to try to meet with people on Saturday night (brokers, carriers) so that I had one more day of availability there. Later on, I realized many of my contacts flew in on Sat night or Sunday so it didn't work out.  I would prefer not to have that segregated out onto a personal charge.

(*Id.*)  Reinhold replied that Plaintiff should have changed her flight if her scheduled meetings were cancelled.  (*See id.* at 49.)  Plaintiff contended "[t]here wasn't any availability with flights," and advocated that, "[i]n addition, I booked a cheaper hotel but the trade off was it was too far from the convention center. (Other hotels were $400 per night)."  (*Id.*)  Reinhold responded that he "ha[d] no issue with tacking a personal weekend on a business trip," but, that like he did, Reinhold expected Plaintiff to "allocate the charges between what is personal and what is business."  (*Id.*)  Plaintiff continued to express her preference "to not have [the Saturday

expenses] charged to my personal expenses when the intent was for meetings," reiterating her

intention "for the weekend (less Friday night)" to be "carved out for these meetings [with

brokers and carriers]," further explaining that "without the business meetings, I would have just

flown a day later." (*Id.* at 48-49.)  Reinhold was unpersuaded and appeared to challenge the

veracity of Plaintiff's representations, stating in a May 22, 2013 email:

> I did not really want to forensically examine your expense report
> but there is only so much BS than [*sic*] I can deal with.  This is the
> end of this email trail and this issue as far as I am concerned.
>
> I grew up in SoCal. . . .  I know it very well.
>
> There are 5 major airports in SoCal – Los Angeles; Burbank;
> Ontario; Long Beach; Orange County.  Every possible airline
> serves the SoCal market.  There is no possible way that all flights
> to all SoCal airports were impacted.  RIMS is nowhere near a big
> enough event.  You could have changed flights and flown out on
> Sunday.
>
> RIMS was at the Convention Center in downtown LA.  You stayed
> at a hotel in Century City.  It does not appear that you paid for
> parking at the conference and RIMS had free shuttles running from
> your hotel to the conference.  So I presume you did the logical
> thing and took the shuttle to the conference on Monday and
> Tuesday.  However, you put 322 miles on your rental car over the
> 5 day period.  I know the distance from Burbank to the hotel; so I
> would presume that was personal mileage on the weekend.  I
> would presume you were at the conference on Monday and
> Tuesday.  On Wednesday you went to the 3rd Ave Promenade in
> Santa Monica (I know it well), which is not very close to the LA
> convention center, then went to Burbank in late afternoon for flight
> back to NY.
>
> Bottom line – the first two days of hotel and rental car are
> personal.  Adjust the report.

(*Id.* at 48.)

Undeterred, Plaintiff sent another email to Reinhold on June 10, 2013, recognizing that

Reinhold did not believe Plaintiff when she said she could not locate flights leaving on Sunday

and offering to "sign an affidavit that this [wa]s the case." (Ex. V (ECF No. 59-3 at 52).) She again advanced her position that she traveled "a day earlier to accommodate . . . meetings" with brokers and carriers, but "due to logistics of Los Angeles, meetings and apts did not occur," and explained that she had spent several hours at the RIMS conference on Sunday. (*Id.* at 52-53.) Plaintiff concluded that "[t]he last thing [she] cared about doing was extending a business trip," and she "strongly fe[lt] at least one if not both days should be reimbursed as a business expense." (*Id.* at 53.) She asked Reinhold to reconsider his decision. (*See id.*)

In response, Reinhold wrote, *inter alia*:

> I won't recount the detailed email I sent you on this topic. This is not personal. I am the chief custodian of the company's treasury and I need to ensure that all expenditures are business related. I have in front of me a request to approve payment for 5 days of hotel and rental car for a 2 day seminar where the seminar and hotel were connected by shuttle. It doesn't smell right on its face which is what started this entire process. I need to be able to satisfy myself and anybody that might question it (e.g. – our CEO) that it is a legitimate business expenditure.

(*Id.* at 52.) Nonetheless, Reinhold acquiesced to Plaintiff's reconsideration request on two conditions: she provide contemporaneous emails (1) to and from brokers and carriers showing both the establishment of and cancellation of meetings on Saturday, and (2) to and from the Company's travel agency showing Plaintiff's attempts to change her outbound flight (after learning of cancelled meetings) and the travel agency's response that the requested change could not be accommodated. (*See id.*) On June 11, 2013, Plaintiff sent Reinhold an email with a "sampling of emails indicating [her] attempts to schedule various appts/events over the weekend." and explaining her understanding that the Company's travel agency "does not send emails on flight availability." (Ex. W (ECF No. 59-3 at 55).)

*F.  Plaintiff's Contemporaneous Pregnancy Announcement*

While Plaintiff was trying to resolve Reinhold's challenge to her expense report for the Trip and during a May 31, 2013 meeting with Lerner, Plaintiff informed Lerner that she was pregnant.  (*See* Def. 56.1 Stmt. ¶70; *see also* Pl.'s Depo. Tr. at 314:10-13.)  Further, in her June 10, 2013 reconsideration request email to Reinhold, Plaintiff stated she was pregnant.  (*See* Ex. V (explaining why Plaintiff did not wish to extend her business trip: "I also was sick with morning sickness and complete exhaustion from my first trimester of pregnancy.").)  In her June 11, 2013 email to Reinhold, Plaintiff reiterated she "was not feeling well from [her] pregnancy and . . . would have preferred to stay home for the weekend and be with [her] family rather than traveling to CA . . . ."  (Ex. W (ECF No. 59-3 at 55).)

*G.  The Company's Investigation of Plaintiff's Expense Report and the Resulting Events*

On June 13, 2013, Reinhold asked White to investigate Plaintiff's RIMS expense report.  (*See* Ex. Y (ECF No. 59-3 at 76).)  White's initial investigation included reviewing the expense report, selected emails, and phone records, and interviewing Plaintiff, Reinhold, Lerner, Risk Management Associate Ingrid Katz, the Company's Global Industrial Controller, Mary Lou Murphy, and a Company receptionist.  (*See id.*; *see also id.* at 78; Ex. 40 (ECF 59-10 at 132-34).)  Its scope was later broadened to include email exchanges between Plaintiff and Murphy and then between Plaintiff and the Receptionist.  (*See id.* at 78.)

On June 21, 2013 and as a result of the investigation, Lerner delivered to Plaintiff a letter advising her she was "being place on paid administrative leave effective immediately," which would "remain in place pending management's further review of the findings of the Internal Audit investigation of the expenses you submitted for the RIMS trip in April 2013, and other

matters that arose in the course of the investigation.[5] On June 24, 2013, Plaintiff sent a

responsive email to Lerner and Ward. (*See* Ex. 41 (ECF No. 59-10 at 136).) Primarily, she

defended her Expense Report, asserting it was neither false nor misleading and that White

ignored her responses that it was "correct and proper". (*Id.*) She then acknowledged she "did

express concerns over the lack of product compliance at Systemax, but that those

"communications regarding product compliance problems were always, conveyed out of concern

for and in support of the best interests of the Company and its customers." (*Id.*) There were also

further explanations provided and defenses made in response to the other matters raised as a

result of White's investigation.[6] (*See id.*) Espousing her loyalty to the Company as

demonstrated by "delivering excellent performance results," Plaintiff concluded by stating her

belief that Lerner's June 21st "letter and your actions are retaliatory in nature and occasioned by

my good faith actions, including my recent advise that I am pregnant and will need to take

childcare leave." (*Id.*)

---

[5] These other matters, not relevant to the Court's disposition of the Summary Judgment Motion, included, *e.g.*, "using the Company's email system to send others libelous, disparaging and discriminatory statements about your colleagues, peers and superiors and have made disparaging and insulting comments about the Company itself" (Ex. Z (ECF No. 59-3 at 83)); "[Plaintiff's] attempt[s] to alter the operation" of the Company's instant messaging program to conceal her actual activities and availability; and "evidence of repeated instances of [Plaintiff] failing to perform very basic aspects" of her job. (*Id.* at 84.)

[6] For example, Plaintiff addressed her adjustment of the Company's instant messaging system, explaining: the system defaults to "unavailable" "after five minutes of inactivity on one's computer"; while she was often at her desk doing work, she was not always working on her computer, thereby causing the system to automatically and inaccurately indicate she was "unavailable"; when she learned the five-minute default could be adjusted, she would do so "to accurately indicate [her] availability to others so they knew they could get in touch with [her] in the office." (Ex. 41 (ECF No. 59-10 at 136).) Plaintiff's intention "was to convey accurate information," and she saw nothing in the company's policies precluding the adjustment in order to reflect accurate information. (*Id.*) Plaintiff continued by stating her belief that she had not "made any 'libelous, disparaging discriminating statements,' and [Lerner's] letter does not specifically identify any such statements." (*Id.*)

White memorialized his investigation of Plaintiff's Expense Report and the additional matters in a June 26, 2013 "Internal Audit Special Report" (hereafter, the "Audit Report").[7] (*See* Ex. Y (ECF No. 59-3 at 74).) By letter dated June 26, 2013, Reinhold informed Plaintiff that she had "failed to satisfactorily address the serious concerns identified in the Internal Audit investigation or otherwise . . . satisfactorily explain [her] behavior, including the other troubling matters described in [Lerner's] June 21 letter." (Ex. AA (ECF No. 59-4 at 2).) She was terminated "for cause" that same day. (*Id.*)

### H. Plaintiff's Complaints After Termination

#### 1. With the Equal Employment Opportunity Commission ("EEOC")

On October 8, 2013, Plaintiff filed a "Charge of Discrimination" with the EEOC alleging discrimination based on sex, pregnancy, and retaliation. (*See* Ex. B (ECF No. 59-2 at 9).) She alleged she was retaliated and discriminated against for sending the March 29th Email to Leeds

> about the [C]ompany's failure to meet product compliance goals and the fact that her department was inadequately staffed and resourced relative to the departments headed by her male peers. At the same time, [Plaintiff] also specifically complained that she was being paid less than her male peers on the Executive Management team.

(*Id.*) She claimed she was thereafter demoted, being directed to report to Lerner instead of Reinhold, the CFO (*see id.*); that after informing the Company she was pregnant, she was discriminated and retaliated against by being subjected "to an unwarranted internal audit of an allegedly personal expense" (*id.*); and that she was terminated in June 2013 "for her complaints about the [C]ompany's discriminatory inadequate resource allocation to the global safety,

---

[7] While Defendants dispute them, Plaintiff highlighted what she considers to be "significant infirmities" in White's investigation. (*See* Pl. 56.1 Stmt. ¶206 (inclusive of sub-¶¶206.1-206.14); *cf.*, Def. 56.1 Reply ¶206.)

product compliance and risk management which she headed, and also for her complaints about being discriminated by being paid less than her male peers . . ." (*Id.*)

On June 25, 2015, the EEOC issued a "Dismissal and Notice of Rights" decision, stating:

> Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes Violations of the statutes. This does not certify that the [Company] is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

(Ex. C. (ECF No. 59-2 at 15).)

### 2. With the Department of Labor

On August 27, 2013, Plaintiff filed a retaliation complaint letter with the Department of Labor ("DOL"), Occupational Safety & Health Administration ("OSHA"). (*See* Ex. A (ECF No. 59-2 at 2-5).) Among other things, she stated that Wagner left the Company in March 2013, which "resulted in all of the global safety and product compliance responsibilities of [the Company] to be performed by [Plaintiff]." (*Id.* at 3.) She further reported her March 29, 2013 Email to Leeds "about the [C]ompany's failure to meet product compliance requirements because there was no Global Safety Manager or a Product Compliance Manager" making the Company "susceptible to violations under the CPSIA." (*Id.*) Plaintiff asserted the March 29th Email "constituted 'protected activity'," and, therefore, her subsequent termination was retaliatory in nature and violated her rights under CPSIA. (*See id.* at 4.)

There is no DOL/OSHA decision regarding Plaintiff's CPSIA whistleblower complaint. Rather, the record contains a July 10, 2015 letter from Plaintiff's counsel to the DOL requesting her complaint be withdrawn from OSHA's jurisdiction so that Plaintiff could proceed with her whistleblower claim in federal court. (*See* Ex. D (ECF No. 59-2 at 17).) It is not clear from the record if that request was granted. (*Cf., id.* (requesting "Right to Sue" letter).) *See also* 15

U.S.C. § 2087(b)(4) ("If the Secretary [of Labor] has not issued a final decision within 210 days after the filing of the complaint, or within 90 days after receiving a written determination, the complainant may bring an action at law or equity for de novo review in the appropriate district court of the United States with jurisdiction . . . .").

III.     The Instant Action

    *A. Procedural Background*

On September 24, 2014, Plaintiff filed this action alleging federal Equal Pay Act and state equal pay violations.  On May 29, 2015, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Defendants moved to dismiss Plaintiff's Complaint.  On September 22, 2015, while Defendants' motion was pending and after Plaintiff had received her "right-to-sue" letter from the EEOC, Plaintiff filed her SAC (*see* ECF No. 25) alleging: (1) that Defendants violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) *et seq.* ("EPA"), and similar provisions of the New York State Labor Law ("NYLL") by paying her less than similarly situated male colleagues and retaliating against her after she complained of the disparity; (2) that Systemax violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("PDA"), and similar provisions of the New York State Human Rights Law ("NYSHRL") by discriminating against her on the basis of gender and/or pregnancy and retaliating against her after she complained of such discrimination; (3) that Leeds and Reinhold violated the NYSHRL by aiding and abetting Systemax in its gender and/or pregnancy discrimination and retaliation; (4) that Defendants violated 15 U.S.C. § 2087, the whistleblower protection provision applicable to the Consumer Product Safety Improvement Act of 2008 (Pub. L. No. 110-314 (HR 4040)) ("CPSIA"), by retaliating against her after she reported concerns about Systemax's compliance with the CPSIA;

and (5) that Defendants violated 18 U.S.C. § 1514A(a), the whistleblower protection provision of the Sarbanes-Oxley Act of 2002 (Pub.L. No. 107-204, 116 Stat. 745) ("SOX"), by retaliating against her after she reported concerns about product safety and/or risk management issues that she contends should have been disclosed to shareholders. Defendants moved to strike the SAC. (*See* ECF No. 26.)

On September 28, 2015, Plaintiff also filed a separate action, Case No. 15-cv-5596, which included identical Title VII and pregnancy discrimination claims, but did not include her Equal Pay Act claims. On the same day and in this case, Plaintiff filed a motion to consolidate her new action with this one. (*See* ECF No.27.)

In an October 26, 2015 decision, this Court denied Defendants' Rule 12(b)(6) motion and motion to strike the SAC, and granted Plaintiff's consolidation motion. (*See* ECF No. 30.) Thereafter, the SAC was deemed the operative complaint, this case was the designated the active case, and Plaintiff's later case, No. 15-cv-5596, was closed. (*See* ECF No. 33.)

On April 15, 2016, Defendants moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for partial judgment on the pleadings of the SAC as to Plaintiff's EPA/NYLL pay discrimination claims and her SOX retaliation claim. (*See* ECF No. 41.) On November 7, 2016, the Court granted Defendants' motion as to Plaintiff's SOX retaliation claim and denied it as to Plaintiff's EPA/NYLL pay discrimination claims. (*See* ECF No. 50.)

### B. The Instant Summary Judgment Motion

Defendants now seek summary judgment dismissing Plaintiff's claims *in toto*. As to Plaintiff's unequal pay claims, Defendants argue she cannot make out a *prima facie* case since she cannot show her alleged comparators performed equal work on jobs requiring equal skill, effort, and responsibility. (*See* Defs.' Summ. J. Memo.(ECF No. 59-5; hereafter, "Def. Memo")

at 5-12.)  Indeed, she "admitted repeatedly during her deposition that she could not perform her alleged comparators' jobs."  (*Id.* at 8 (citing Def. 56.1 Stmt. ¶¶99, 107, 112, 117, 123).) Alternatively, they contend that even if Plaintiff could make out a *prima facie* case, Defendants can justify the wage disparity on a factor other than sex, *i.e.*, "a lower monetary value on the risk management function versus the primary functions of [Plaintiff's] comparators," which is based on benchmarking data.  (*Id.* at 13-14.)  "Once such a factor is identified, it is not the Court's role to second-guess an employers' [*sic*] business judgment."  (*Id.* at 13 (citing *Harker v. Utica Coll. of Syracuse Univ.*, 885 F. Supp. 378, 390 (N.D.N.Y. 1995)).)

Similarly, regarding Plaintiff's claims of discriminatory pay on the basis of her gender in violation of Title VII and the NYSHRL, Defendants argue, first, that Plaintiff cannot establish that her position and that of her alleged comparators were substantially equal (*see id.* at 14-15), and, second, that she cannot establish the requisite discriminatory animus (*see id.* at 15-16). Moreover, assuming Plaintiff could make out a case of pay discrimination, "Defendants have set forth legitimate and non-discriminatory reasons for any disparate pay" (*id.* at 16), *i.e.*, the difference in responsibilities, experiences, and functions between Plaintiff's position and that of her comparators (*see id.* (citing Defendants' earlier discussion of Company's non-gender based reason for differential in Plaintiff's compensation).)

Regarding Plaintiff's retaliation claims pursuant to the EPA, Title VII, NYLL and NYSHRL, Defendants claim Plaintiff cannot meet her burden of establishing a *prima facie* case because: "[S]he did not engage in protected activity and she has not established a causal connection between her alleged protected activity and the termination of her employment."  (*Id.* at 17.)  It is the Defendants' position that Plaintiff has not engaged in protected activity since her

complaints to Reinhold and Leeds were not specific enough to put them and the Company on notice that she was opposing an unlawful practice.  (*See id.* at 19; *see also id.* at 17-19.)

Defendants raise a similar argument as to Plaintiff's retaliation claim under CPSIA: Plaintiff "has not established that she engaged in protected activity under the statute."  (*Id.* at 20.)  In this instance, that activity would be "providing to the employer information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the Consumer Product Safety Act or any other Act enforced by the Consumer Product Safety Commission, or any order, rule, regulation, standard, or ban under any such Acts."  (*Id.* (citing 15 U.S.C. § 2087(b)(2)(B)).)  Defendants argue Plaintiff cannot meet the dual requirement of showing both a subjective and an objective "reasonable belief" of a statutory violation (*see id.* at 21), since her complaint was really about a staffing decision with which she did not agree (*see id.* at 21-22).

Finally, Defendants posit that Plaintiff cannot establish a *prima facie* case of discrimination based on her pregnancy since she "cannot establish that her discharge occurred under circumstances giving rise to an inference of discrimination."  (*Id.* at 23; *see also id.* at 22-23.)  "Simply stated, Plaintiff has not produced a scintilla of evidence tending to establish that her pregnancy played any role in Systemax's decision to terminate her employment."  (*Id.* at 23.)  Therefore, to the extent Plaintiff "attempt[s] to rely on temporal proximity alone to defeat" the Summary Judgment Motion, the Defendants urge the Court to reject that inference "because courts in this Circuit typically only allow an inference of discrimination to arise based upon temporal proximity alone where the period between notification of pregnancy and the adverse employment action is almost immediate."  (*Id.* at 24 (citing cases with temporal spans ranging from 7 to 18 days).)

In opposition and as to her federal and state equal pay claims, Plaintiff contends the only element of those causes of action Defendants are challenging is whether she and her comparators performed equal work on jobs requiring equal skill, effort and responsibility (*see* Opposition at 8.) As to that, Plaintiff claims the facts of her case raise a genuine dispute of material fact precluding summary judgment because her job and that of her comparators had common duties, which is all that is required (*see id.* at 8, 10; *see also id.* at 14), rather than jobs in "different horizontal functional areas . . . with different 'integral' purposes" (*id.* at 10) as Defendants assert. (*See also id.* at 14-19 (Plaintiff's further contentions that she and her comparators performed equal work).)

Plaintiff also challenges Defendants' alternative argument that their "factor other than sex" justification, *i.e.*, the use of benchmarking data, is a pretext and cannot be justified by Defendants. (*See id.* at 19-20.) She also contends Defendants "effectively left out an entire function for which [Plaintiff] was responsible (product compliance, front-end vetting, product recalls)," thereby further undervaluing her position (*Id.* at 20.)

Further, Plaintiff argues that the Defendants parsed the terminology of her March 29th Email to support their argument that Plaintiff did not engage in protected activity in sending that communication when Plaintiff, requesting to be "paid similar to [her] peers in NY", "identified those peers – *all of whom are male* – by name." (*Id.* (emphasis in original).) Plaintiff contends the March 29th Email was "escalating" prior verbal complaints and putting the Company on inquiry notice "such *that they should have asked her* if she was alleging discrimination:" (*Id.* at 21 (emphasis added).) She also posits that Reinhold's April 9th Email "shows [the Company] perceived her complaint as potential 'whistleblowing' [activity]." (*Id.*)

In defense of her CPSIA Retaliation claims, Plaintiff asserts that she made numerous complaints regarding the lack of coverage for product compliance upon Wagner's departure. (*See id.* at 21.) She relies on a closing statement in Reinhold's April 9th Email that Leeds remained directly available to her for whistleblower reporting purposes, arguing this statement supports her "reasonable belief" that there had been a violation of CPSIA. (*See id.* at 22.). Failing to address the two prongs of the applicable "reasonable belief" standard, Plaintiff simply contends, "[c]ourts have held that the 'reasonable belief' factor is met where a 'Plaintiff would be implicated immediately if any oversight or inconsistencies were detected . . .' ." (*Id.* (quoting *Stewart v. Doral Fin. Corp.*, 997 F. Supp.2d 129, 138 (D.P.R. 2014)(in context of dismissal motion, examining allegations in determining whether plaintiff plausibly alleged a reasonably objective belief of a potential violation of the Sarbanes-Oxley Act)).)

Finally, addressing her pregnancy discrimination claim, Plaintiff asserts the only real issue to consider is the "inference of discrimination", but continues by relying on incidents which occurred before she informed the Company of her pregnancy. (*See id.* at 23-24.)

### C. The Court's Rulings on Plaintiff's Objections

In her Rule 56.1 Counterstatements, Plaintiff raises several objections to Exhibits attached to Defendants' Mancher Declaration (ECF No. 59-1). (*See* Pl.'s 56.1 Stmt. at Part.I ("General Objections").) Regarding Plaintiff's objections to Exhibits A-E, G, I, K, L, P, and S on authenticity grounds (*see id.* at Part II(A)), those objections are overruled. In its broad discretion, the Court is satisfied that the exhibits are what they purport to be. *See, e.g., SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 344 (2d Cir. 2004); *see also* Fed. R. Evid. 901. Indeed, the Bates stamps on Exhibits A and D indicate those documents were produced by Plaintiff in discovery, making her challenge to their authenticity disingenuous. The same is true

regarding the EEOC related exhibits, Exhibits B and C, which were generated in response to Plaintiff's EEOC compliant.  Likewise, Plaintiff has not provided any convincing reason to doubt the authenticity of Exhibits E, G, I, K, L, which are Systemax-generated documents, and, in any event, are not crucial to Plaintiff's case.  Other than the potential of casting Plaintiff in a bad light, the Court finds no reason why Plaintiff would object to Exhibit P and, again, finds no reason to doubt its authenticity.  Finally, the Court finds no basis to doubt the authenticity of Exhibit S, which, as the Bates stamp numbers thereon indicate, Plaintiff produced in discovery.

Defendants submitted Exhibits CC and DD in support of their alternative argument in opposition to Plaitnifff's unequal pay claims, *i.e.*, that they had a legitimate business reason for compensating Plaintiff at the levels she was paid while at Systemax.  (*See* Def. Memo. at 13-14.) The Court has found it unnecessary to considered Exhibits CC and DD.  *See infra* at 42-47, note 8.  Therefore, it declines to rule on Plaintiff's objection thereto.  (*See* Pl.'s 56.1 Stmt. at Part.II(B) & (C).)

Finally, Plaintiff objects to the Declarations of Ben White (Ex. II) (*see* Pl.'s 56.1 Stmt. at Part.II(D)), Thomas Axmacher (Ex. KK) (*see* Pl.'s 56.1 Stmt. at Part.II(E)), Robert Baker (Ex. LL) (*see* Pl.'s 56.1 Stmt. at Part.II(F)), Curt Rush (Ex. MM) (s*ee* Pl.'s 56.1 Stmt. at Part.II(G)), and Alan Schaeffer (Ex. NN) (*see* Pl.'s 56.1 Stmt. at Part.II(H)), asserting those Declarations are based upon information, belief, and hearsay.  These declarants are the persons Plaintiff offers as comparators in support of her unequal pay claims.  *See supra* at 11-20.  The Court has the authority to "strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)(relying on Fed. R. Civ. P. 56(e); citation omitted); *see also Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir.

2013)(quoting *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*, No. 03-cv-4034, 2004 WL 912599, at *4 (S.D.N.Y. Apr. 29, 2004)("a court may, in considering a motion for summary judgment, simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or otherwise inadmissible")(collecting cases)).  The objections are sustained, in part, and denied, in part.

Having carefully reviewed each of the above-identified Declarations, the Court finds each has been made under the penalty of perjury pursuant to 28 U.S.C. § 1746, and with the declarant's personal knowledge of the facts set forth in the respective declarations.  (*See* Preamble and ¶1 of Exs. II, KK, LL, MM, and NN.)  Thus, to the extent that each declarant states his educational background, employment history, and his specific core job duties and responsibilities, there is no basis to challenge the declarant's lack of personal knowledge thereto, and Plaintiff's objections to those portions of the Declarations are overruled.  However, to the extent each declarant has been advised about allegations and claims raised in this case, or bases a declaration "upon information and belief", those aspects of the Declarations will not be considered, sustaining Plaintiff's objections.  Thus, for clarity, the Court will not consider:

| Declarant | Exhibit | Paragraphs Not Considered |
| --- | --- | --- |
| White | II | 4, 5*,6, 8, 29-34 |
| Axmacher | KK | 4, 5*, 6, 8, 25-32 |
| Baker | LL | 3, 4*, 5, 7, 23-29 |
| Rush | MM | 3, 4* |
| Schaeffer | NN | 3, 4*, 5, 7, 18-22 |

(*N.B.*:  Those paragraphs designated with asterisks were considered only to the extent they identified certain job duties which were referenced in subsequent paragraphs by the declarants as

listing duties which the declarants also had "in the broadest sense". *See infra* 42-47 for further

discussion.)

IV.    Discussion

    *A. Standards of Review*

        1. Summary Judgment

Summary judgment is appropriate only where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law," *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006)

(quoting Fed. R. Civ. P. 56(c)), and "where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party." *Belton v. City of N.Y.*, 629 F. App'x 50, 50 (2d

Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)). A district court "is not to weigh the evidence but is instead required to view the

evidence in the light most favorable to the party opposing summary judgment, to draw all

reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty*

*Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotations omitted).

In order to defeat a motion for summary judgment, the non-moving party "must do more

than simply show that there is some metaphysical doubt as to the material facts… [She] must

come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v.*

*Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita*, 475 U.S. at 586-87) (emphasis

in original); *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)

("opposing party must provide concrete particulars showing that a trial is needed") (internal

quotations omitted). "It is not sufficient merely to assert a conclusion without supplying

supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

Specifically regarding summary judgment in employment discrimination cases, the Second Circuit has stated:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

2. The EPA/NYLL Standard

"An equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act." *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 29 n.2 (2d Cir. 2015)(internal quotation marks and citations omitted); *see also Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 690 n.1 (2d Cir. 2017) (same; quoting *Talwar*); *Drury v. Waterfront Media, Inc.*, No. 05-cv-10646, 2007 WL 737486, *2 n.1 (S.D.N.Y. Mar. 8, 2007)(same).

> Claims under the EPA are analyzed using a burden-shifting framework similar to that established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ryduchotuski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000). Under the framework, the plaintiff bears the initial burden of establishing a *prima facie* case by demonstrating "that '[i] the employer pays

> different wages to employees of the opposite sex; [ii] the
> employees perform equal work on jobs requiring equal skill, effort,
> and responsibility; and [iii] the jobs are performed under similar
> working conditions.'" *E.E.O.C. v. Port Auth. of N.Y. & N.J.* ("Port
> Authority"), 768 F.3d 247, 254-55 (2d Cir. 2014)(quoting *Belfi v.
> Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)).

*Chiaramonte v. Animal Med. Ctr.*, No. 13-cv-5117, 2016 WL 299026, *8., *aff'd* 677 F. App'x

689 (2017)(brackets in district court decision).

The Second Circuit instructs that the critical inquiry in an EPA claim is the "equal work"

inquiry, "which requires evidence 'that the jobs compared are 'substantially equal,' [which] does

not mean 'identical'." *Chiaramonte*, 677 F. App'x at 691 (quoting *EEOC v. Port Authority*, 768

F.3d at 255). Thus, a court "must focus upon 'the congruity and equality of actual job content,'

and 'not job title or description.'" *McCullough v. Xeroz Corp.*, 224 F. Supp.3d 193, 196

(W.D.N.Y. 2016)(quoting *EEOC v. Port Authority*, 768 F.3d at 255). Hence, "broad

generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of

. . . discrimination, cannot suffice." *Id.* at *197 (quoting *EEOC v. Port Authority*, 768 F.3d at

256).

> This inquiry is informed by the EPA's implementing regulations,
> which provide that "[s]kill includes consideration of such factors
> as experience, training, education, and ability," 29 C.F.R. §
> 1620.15(a); "[e]ffort is concerned with the measurement of the
> physical or mental exertion needed for the performance of a job,"
> 29 C.F.R. § 1620.16(a); and "[r]esponsibility is concerned with the
> degree of accountability required in the performance of the job,
> with emphasis on the importance of the job obligation," 29 C.F.R.
> § 1620.17(a). *See also Usery v. Columbia University*, 568 F.2d
> 953, 959 (2d Cir. 1997).

*Drury*, 2007 WL 737486, at *3 (brackets in *Drury*).

3.  The Title VII/NYSHRL Standard

Under Title VII, it is unlawful for an employer to, *inter alia*, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A viable Title VII discrimination claim requires a showing that "(1) the employer took adverse action against [the plaintiff] and (2) [the plaintiff's] race, color, religion, sex, or national origin was a motivating factor in the employment decision."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).

Workplace discrimination claims, whether brought under Title VII or NYSHRL, are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Mandell v. Cty of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003); *Sotomayor v. City of N.Y.*, 862 F. Supp.2d 226, 251-52 & 257 (E.D.N.Y. 2012). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) that she is a member of a protected class; (2) that she is qualified for his position and was satisfactorily performing her duties; (3) that she suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination.  *See, e.g., Vega*, 801 F.3d at 83; *Weinstock v. Columbia Univ.*, 224 F. 3d 33, 42 (2d Cir. 2000); *Sotomayor*, 862 F. Supp. 2d at 253.  "Once a plaintiff has established a prima facie case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors."  *Vega*, 801 F.3d at 83 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)). "The burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment."  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802).  "If the

employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804; additional citation omitted).

4. The Retaliation Standard

A retaliation claim, like a workplace discrimination claim, is analyzed under the *McDonnell Douglas* burden-shifting rubric. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013); *Tanvir v. N.Y. City health & Hosps. Corp.*, 480 F. App'x at 622. First, the plaintiff must establish a *prima facie* case of retaliation by showing that: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa*, 708 F.3d at 125 (quotations and citations omitted). The definition of "adverse employment action," as it applies to retaliation claims, is broader than it is for substantive discrimination claims; thus, it "is not limited to discriminatory actions that affect the terms and conditions of employment," but includes actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006) (quotations and citations omitted).

If a plaintiff can establish a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory reason for its adverse employment action. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.8 (2d Cir. 2011); *Villavicencio v. Gure-Perez*, F. Supp.3d 178, 188 (E.D.N.Y. 2014)(quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013)). If the defendant is able to do so, the plaintiff has a renewed burden of producing evidence that the employer's avowed reason is pretextual and that retaliatory motivation was the "but-for" cause of the challenged action. *Univ. of Texas S.W. Med. Ctr. v.*

*Nassar*, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrong action or actions of the employer."); *accord Bowen-Hooks v. City of N.Y.*, 13 F. Supp.3d 179, 220-21 (E.D.N.Y. 2014) ("If the employer succeeds at the second stage, the presumption of retaliation dissipates, and the plaintiff must show that, *but for* the protected activity, she would not have been terminated.") (citing *Nassar*, 133 S. Ct. at 2534; emphasis in original).

After the Supreme Court's *Nassar* decision, the Second Circuit clarified that "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 846 (quoted in *Villavicencio*, 56 F. Supp.3d at 189).

   B. *Analysis of Plaintiff's Claims*

      1. Unequal Pay Claims (re: Counts 1 and 3)

Plaintiff cannot make out a *prima facie* case of unequal pay. Notwithstanding that Plaintiff and her comparators shared a title of "Vice President" and performed certain generic management functions, such as, *e.g.*, budgeting, supervising other employees, creating and implementing policies and guidelines, their jobs were different. *See supra* at 11-20; *see also Tomka*, 66 F.3d at 1310 (rejecting reliance on "job title or description" alone under EPA); *EEOC v. Port Authority*, 768 F.3d at 255 (the equal work inquiry is a demanding standard "requiring

42

evidence that the jobs compared are 'substantially equal'"), and at 257 ("bland abstractions" say nothing about whether the comparators were required to perform "substantially equal" work); *Chiaramonte*, 2016 WL 299026 at * 14 (collecting cases); *Drury*, 2007 WL 737486, at *3 ("Although 'comparators' need not occupy an identical job to plaintiff, jobs that are 'merely comparable' in some vague way are insufficient to satisfy a plaintiff's prima facie burden.")(citing *Tomka*, 66 F.3d at 1311).

As in *Chiaramonte*, "the parallels Plaintiff draws are far outstripped by the material differences" in the job contents "between and among Plaintiff and her alleged comparators." 2016 WL 299026, at *10  Indeed, the disparity in job content in this case is more glaring than in *Chiaramonte* where the plaintiff and the comparators were all veterinarians.  *See id.* at *9. Notwithstanding a shared profession, the *Chiaramonte* court, nonetheless, found "[n]o reasonable juror could find that Plaintiff performed substantially equal work to the male veterinarians she identified as comparators," *id.* at *10, since the actual content of the comparators' jobs differed substantially, requiring wholly different skill and effort.  *See id.* at *11-13; *see also id.* at *14 (rejecting as untenable plaintiff's contention of equal work based on theory that all parties held positions as department heads); *see also EEOC v. Port Authority*, 768 F.3d at 257 (rejecting contention that female and male attorneys at the Port Authority performed equal work by virtue of them all being lawyers).

As Plaintiff's testimony indicates, significant disparity in job content is present here, *to wit*:

> (a) <u>as to White</u>, Plaintiff testified, *inter alia*:
>
> Q:     You're not qualified to perform [White's] job, isn't
>          that right?
> A:     Correct.
> Q:     You could not perform his job, isn't that correct?

A:     Correct.  And he couldn't perform mine.

(Pl.'s Depo. Tr. at 129:5-10.)  Further, the Company's requirement that White, as the Vice President of Internal Audit for the Company, have an accounting degree and a CPA certification, *see supra* at 14, underscores that his job was not equal to Plaintiff's, which had no such qualification requirement, *see supra* at 12-13;

> (b) <u>as to Axmacher</u>, Plaintiff testified, *inter alia*:

> Q:     You don't know whether or not his job was harder
>         or easier than your job, do you?
> A:     I don't know.
> Q:     You could not do his job, could you?
> A:     No, and he couldn't do my job.
> * * *
> Q:     He has a larger number of direct reports than you
>         have, isn't that right?
> * * *
> A:     He had more direct reports.

(Pl.'s Depo. Tr. at 125:3-25.)  Moreover, as the Company's CFO, Axmacher was required to have prior auditing experience, as well as a CPA certification and certain specialized knowledge of a financial accounting module, which was not required of the head of Risk Management.  *See supra* at 15-16; *cf. supra* at 12-13;

> (c) <u>as to Baker</u>, Plaintiff testified, *inter alia*:

> Q:     You don't know whether he [*i.e.*, Baker] needs
>         more in the way of specialized knowledge than you
>         do, do you?
> A:     We have similar levels of specialized knowledge as
>         department heads running departments,
>         multinational departments for the company.
> Q:     I understand that, that there's specialized
>         knowledge required in each position, but you have
>         no way to judge the extent or the amount of
>         specialized knowledge he has versus what you
>         have, isn't that right?
> A:     Correct.
> Q:     You couldn't step in and do his job, isn't that right?

> A: And he couldn't step in and do my job.
> Q: So the fact of the matter is you each have distinct positions requiring distinct skills, requiring distinct knowledge, isn't that right?
> A: We operate at the same level as department heads and subject matter experts for the organization.
>     * * *
>     We have different knowledge.

(Pl.'s Depo. Tr. at 123:11-124:14.)  Additionally, as the Company's European Controller, Baker was required to have prior accounting experience, a certified CPA, and prior experience as a financial controller, none of which was required of the head of Systemax's Risk Management Department, to ensure proper execution of his management responsibilities regarding all financial aspects of Systemax's European business units.  *See supra* at 17-18; *cf. supra* at 12-13;

        (d) <u>as to Rush</u>, Plaintiff testified, *inter alia*, that while working for Systemax:

> Q: You were not registered as an attorney?
> A: That's correct.
> Q: It would have been unlawful for you to practice law, isn't that right?
>     * * *
> A: Probably.
> Q: So at that time, you could not have done Curt Rush's job?
> A: I was the department head of risk management, not the head of legal.  I didn't have to be an attorney for my vice president of risk management role at Systemax.
> Q: * * * What I'm simply saying is that you could not have – could not lawfully have performed Curt Rush's job while you were at Systemax –
>     * * *
>     – isn't that true?
> A: Correct.

(Pl.'s Depo. Tr. at 127:12-128:8.)  Rush's core duties and responsibilities encompassed diverse

legal matters that affected the Company's business, *see supra* at 18-19, which was not part of

Plaintiff's core duties and responsibilities, *cf., supra* at 12-13; and

> (e) <u>as to Schaeffer</u>, Plaintiff testified:
>
> Q:    You could not have done Alan Schaeffer's job, isn't
>        that right?
> A:    Correct.

(Pl.'s Depo. Tr. at 18:9-11.)  Schaeffer was an engineer responsible for Systemax's facilities,

including their designs and construction, as well as locating, leasing, or buying commercial

properties for the Company, both domestically and abroad.  *See supra* at 20.  Plaintiff had no

such responsibilities, *cf.*, *supra* at 12-13, nor is there any evidence she had any experience as an

engineer, *see id.* at 3-4.

Thus, by her own testimony, Plaintiff eviscerates her unequal pay claims.  As to each

comparator, Plaintiff admitted she could not do his job and he could not do her job.  That is

because their jobs were not substantially equal.  Indeed, the summary judgment record

establishes that the skills necessary to perform the jobs of each of Plaintiff's proposed

comparators differed from those necessary to perform Plaintiff's Risk Management job.  To the

extent there was overlap of job content between Plaintiff's job and that of her comparators, it is

insufficient to show the necessary substantial equality in jobs to sustain her *prima facie* burden.

*See, e.g., Husser v. N.Y. City Dept. of Educ.*, 137 F. Supp.3d 253, 267 ("[S]ome overlap in the

requirements of the two jobs is not . . . 'sufficient to show substantial equality under the EPA.'"

(quoting *Detrick v. H&E Machinery, Inc.*, 934 F. Supp.63, 70 (W.D.N.Y. 1996); further citation

omitted)).  Likewise, the record demonstrates that the qualifications and experiences of Plaintiff

and her proposed comparators differed significantly.  *Cf.*, *supra* at 3-4, 12-13 (re; Plaintiff), *with*

*supra* at 13-15 (re: White), at 15-16 (re: Axmacher), at 16-18 (re: Baker), at 18-19 (re: Rush), and at 20 (re: Schaeffer). These differences in qualifications and experiences are further evidence that Plaintiff cannot meet her *prima facie* burden. Since Plaintiff cannot establish a *prima facie* case of unequal pay for substantially equal work,[8] a rational factfinder would be precluded from finding in Plaintiff's favor on her equal pay claims.

### 2. The Gender/Pregnancy Discrimination Claims (re: Counts 5, 7, 8, 9)

The parties do not dispute that to make out a *prima facie* claim of discrimination, Plaintiff must show (a) she is a member of a protected class, (b) she suffered an adverse employment action, and (c) that such action occurred under circumstances giving rise to an inference of discrimination. (*See* Opposition at 23; *cf.*, Def. Memo. at 22-23.) Nor is there serious debate that Plaintiff can make a showing as to the first and second factors of that *prima facie* case. Instead, the Parties' disagreement concerns whether Plaintiff can make the requisite showing of an "inference of discrimination". (*See* Opposition at 23; *cf.*, Def. Memo. at 16.) Plaintiff contends:

> there is ample evidence of discrimination, including, but not limited to: (1) Defendant Reinhold's explicit comments about receiving oral sex and engaging in other transactions of a sexual nature with various women; (2) Reinhold's comments concerning [Plaintiff's] "executive image" while not making similar comments concerning the attire of males in the workplace; (3) Reinhold's comments about the length of [Plaintiff's] skirt; (4) Reinhold's ridicule of Plaintiff and laughter at her expense; (5) [] Reinhold's belittling of [Plaintiff's] ambition to become Chief Operating Officer of the Company; [] Reinhold's communication of a misogynistic joke to [Plaintiff], in violation of the Company's sexual harassment policy; (6) []Reinhold's disparate application of office hours and vacation policies to [Plaintiff's] detriment; and (7) []Reinhold's refusal to allow the only department run by a female to expand, while simultaneously allowing male-run departments to double or triple their original sizes.

---

[8] Therefore, the Court need not, and declines to, consider Defendants' proffered alternative defense.

(Opposition at 23-24 (citing Pl. 56.1 Stmt ¶¶203-213; hereafter, "Offered Discriminatory Evidence"); *see also id.* at 24 (asserting the Offered Discriminatory Evidence makes out a "*prima facie* claim for disparate treatment on the basis of gender/pregnancy")).)

*(a.)  Gender Discrimination*

Neither Plaintiff's pleadings nor her arguments in support of her gender discrimination claims are examples of clarity.  Indeed, it appears as if she would have this Court develop her arguments in favor of her gender discrimination claims, noting in the section of her Opposition brief addressing her equal pay claims: "Plaintiff also asserts disparate pay claims under Title VII and the NYSHRL, which share the same elements as the EPA and NY EPA claims, and require an additional showing of discriminatory animus, addressed in Section III(6), below (concerning plaintiff's disparate treatment/pregnancy discrimination claim)."  (Opposition at 5 n.2.)  Then, in the referenced Section III(6), entitled "Plaintiff's Pregnancy Discrimination Treatment Claim", Plaintiff further notes:

> This 'inference of discrimination' is also a requirement of Plaintiff's Title VII and NYSHRL claims for disparate pay, as set forth in footnote 2, *supra*.  Plaintiff has established this element of her Title VII and NYSHRL claims for the same reasons as set forth in the paragraph below, addressing the same element in the context of her Title VII claims of gender and pregnancy discrimination.

(*Id.* at 23 n.3.)  From that, the Court infers that Plaintiff is relying upon the Offered Discriminatory Evidence, *supra* at 47.

To the extent Plaintiff is advancing an argument of disparate pay in violation of Title VII and NYSHRL, her argument fails.  First, Plaintiff must demonstrate that the positions held by her purported comparators are substantially equal to her position.  *See Tomka*, 66 F.3d at 1312 ("A claim of unequal pay for equal work under Title VII and the HRL is generally analyzed

48

under the same standards used in an EPA claim.).  As discussed, *supra* at 42-47, Plaintiff is unable to do so.

Second, even if she could make an equal work showing, as a Title VII plaintiff, Plaintiff "must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination." *Tomka,* 66 F.3d at 1313.  However, the evidence Plaintiff proffers fails to demonstrate the requisite discriminatory animus.  While the offered comments (*i.e.*, Offered Discriminatory Evidence, items (1)-(5)) were made by Reinhold, Plaintiff's direct report for most of her tenure with Systemax, Plaintiff fails to offer any temporal connection between those comments and the March 29th Email, wherein she allegedly complained of her discriminatory disparate pay.  Nor, other then evincing Reinhold's boorishness, do those comments, even when considered collectively, establish any nexus to the compensation the Company decided to pay Plaintiff.  At most, they are "stray remarks . . . [which] do not constitute sufficient evidence to make out a case of employment discrimination." *Danser v. Norden, Sys.*, 151 F.3d 56, 56 (2d Cir. 1998); *see also Dominick v. Hosp. Valuation Servs., Inc.*, No. 11-cv-3452, 2013 WL 5460654, at *10 (E.D.N.Y. Sept. 30, 2013); *Schreiber v. Worldco, LLC*, 324 F. Supp.2d 512, 519 (S.D.N.Y. 2008)(in determining whether a comment is probative of discriminatory intent or merely a stray remark, a court should consider: "(1)who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decisionmaking process").  Moreover, Plaintiff's cited materials do not support her further assertions that Reinhold applied office hours and vacation policies in a disparate manner or that he refused to allow Plaintiff to

expand the Risk Management Department. (*See* Opposition at 24 (enumerated items (6) & (7)) (citing Pl.56.1 Stmt. ¶¶203-213).) Additionally, Plaintiff has not pointed to any evidence in the summary judgment record that would support those contentions. (*See, e.g.*, April 9th Email (informing Plaintiff of the work hours expected of those at her level).) Hence, Plaintiff's failure to demonstrate the requisite discriminatory animus to establish a *prima facie* case of gender based discrimination compels the conclusion that no rational factfinder could find in her favor on her gender based discrimination claims.

### *(b.) Pregnancy Discrimination*

In support of her pregnancy discrimination claims, Plaintiff relies on the same Offered Discriminatory Evidence in an attempts to establish an "inference of discrimination". That reliance is more attenuated in the context of Plaintiff's pregnancy discrimination claims as there is no temporal relationship between the Offered Discriminatory Evidence and Plaintiff's May 31, 2013 and June 10, 2013 pregnancy announcements. As to Plaintiff's argument that Reinhold applied office hours in a disparate manner, the evidence supports the opposite. In his April 9th Email, Reinhold stated Plaintiff's peers worked longer hours than she did and he expected her to work like hours as them. (*See* Ex. 32.) Nor is there any admissible evidence that Reinhold applied the Company's vacation policies in a disparate manner or that such application was to Plaintiff's detriment.

Moreover, the record evidence does not show Reinhold refused to allow the Risk Management Department[9] to expand, as Plaintiff contends; rather, it shows Reinhold deferred to Leeds on that decision. (*See* Ex. O (in email chain, instructing Plaintiff to discuss the proposed

---

[9] Notwithstanding that there was at least one other department within Systemax which was "run by a female" (*see, e.g.*, Ex.14 (Natasha Ward Depo. Tr. at 11-12)(testifying that she ran the Human Resources Department for Systemax's U.S. division)), the Court infers Plaintiff means the Risk Management Department, which is the department she headed when she was with the Company.

hiring of two persons to replace Wagner with Leeds).) Furthermore, by Plaintiff's own words, the record establishes that, contrary to her assertion that her department was not allowed to expand, Plaintiff was given permission to replace Wagner with two hires (albeit at junior levels), thereby increasing the Risk Management Department's staff count. (*See* March 29th Email ("I received the good news about getting two new headcount – one for safety and the other for Product Compliance/CPSC . . . .").) In any event, Reinhold's communications with Plaintiff regarding hiring two persons to replace Wagner and Plaintiff's receiving approval for that increased headcount predated Plaintiff's pregnancy announcement. Hence, Plaintiff's reliance on the Offered Discriminatory Evidence to establish the requisite discriminatory animus necessary to carry her pregnancy discrimination claims fails. Additionally, the record is devoid of any evidence showing Defendants criticizing Plaintiff's work in terms related to her pregnancy, made invidious comments about pregnant women, or treated employees who were not pregnant more favorably. Failing to establish Defendants' discriminatory animus based on her pregnancy, Plaintiff cannot make out a *prima facie* case of pregnancy based discrimination; in turn, no rational factfinder could find in Plaintiff's favors on those claims.

3. Retaliation Claims (re: Counts 2, 4, 6, 7, 8, 9, 10)

*(a.) EPA & NYLL, Title VII & NYSHRL*

Retaliation claims brought under the EPA, Title VII, and NYSHRL are analyzed under the *McDonnel Douglas* burden shifting framework. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (same standard applies for retaliation claims under Title VII, EPA, NYSHRL); *see also Caruso v. Bon Secours Charity Health Syt., Inc.*, 703 F. App'x 31, 34 (2d Cir. 2017)(retaliation claims under Title VII and the NYSHRL analyzed under same *McDonnell Douglas* burden-shifting framework). To make out a *prima facie* case of retaliation, a plaintiff

must show (i) she was engaged in a protected activity, (ii) the defendant knew of the protected

activity, (iii) plaintiff suffered an adverse employment action, and (iv) a causal connection

between the protected activity and the adverse employment action.  *See Jute v. Hamilton

Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *see also Van Zant v. KLM Royal Dutch

Airlines*, 80 F.3d 708, 714 (2d Cir. 1996).

      The same standard apply to NYLL retaliation claims:

> In order to establish a prima facie case of retaliation, a plaintiff
> must show "(1) participation in protected activity known to the
> defendant; (2) an employment action disadvantaging the plaintiff;
> and (3) a causal connection between the protected activity and the
> adverse employment action." *Lai v. Eastpoint Intern, Inc.*, No. 99-
> cv-2095, 2000 WL 1234595, at *3 (S.D.N.Y. Aug. 31,
> 2000)(citing *Cruz v. Coach Stores*, Inc., 202 F.3d 560, 566 (2d Cir.
> 2000)).  Once a prima facie case is made, a burden-shifting
> framework applies.  The employer has the opportunity to articulate
> a nondiscriminatory rationale for the action taken, and the
> employee may rebut by showing that it is more likely that the
> adverse action was motivated by discrimination than by the
> employer's proffered nondiscriminatory rationale.  *Brock v. Casey
> Truck Sales, Inc.*, 839 F.2d 872, 876 (2d Cir. 1988)(citing
> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817,
> 36 L. Ed.2d 668 (1973)).

*Lin v. Great Rose Fashion, Inc.*, No. 08-cv-4778, 2009 WL 1544749, at *17 (E.D.N.Y. June 3,

2009); *see also Higueros v. N.Y.S. Catholic Health Plan, Inc.*, 630 F. Supp.2d 265, 269

(E.D.N.Y. 2009) ("In order to establish a prima facie case under New York Labor Law Section

215, the plaintiff must adequately plead that while employed by the defendant, she made a

complaint about the employer's violation of the law and, as a result, was terminated or otherwise

penalized, discriminated against, or subjected to an adverse employment action." (citations

omitted)).

i.  Gender-Based Claims

Plaintiff asserts she complained both verbally and in her March 29th Email about illegal discriminatory compensation, *i.e.*, disparity in her pay based on her gender.  While there is evidence that Plaintiff complained about her level of compensation, there is nothing in the record which evinces that her complaints related to her gender or were based on a violation of law.  (*See* Ex 3 (Leeds Depo. Tr.) at 50:23-53:5 (testifying that Plaintiff "complained numerous, numerous times" about compensation, but not mentioning Plaintiff's gender as a basis for the complaints); Pl. 56.1 Stmt. ¶188; *see also* Ex. Q (March 29th Email).)  Rather, in her March 29th Email, Plaintiff's self-identified whistleblower communication, Plaintiff stated:

> I have mentioned my concerns, but do not believe they are being adequately addressed.  *Relative to my peer group as an executive*, I would like to be an "Executive Officer" under the SEC and paid *similar to my peers in NY* – Tom [Axmacher], Ben [White], Curt [Rush], etc. . . .  I do not think this is an unrealistic expectation.  I was told Heads of Risk Management cannot be "EOs" which actually isn't true.  More than the title, I would like my pay to be more comparable.

(Ex. Q (emphases added).)  At most, Plaintiff has conveyed a desire to be paid like her fellow executive colleagues.  The fact that those colleagues are male does not *per se* morph Plaintiff's complaint into one of gender-based discrimination.  Rather, it is an "[a]mbiguous complaint[]" that do[es] not make the employer aware of allegedly discriminatory misconduct," and, hence "do[es] not constitute protected activity."  *Int'l Health Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp.2d 345, 357 (S.D.N.Y. 2007).  Indeed, one basis for Plaintiff's complaint was hierarchically based, *i.e.*, Plaintiff expressing her desire to be paid relative to those who were fellow executives, and another basis for her complaint was geographically based, *i.e.*, "I would like to be . . . paid *similar to my peers in NY* . . . ."  Plaintiff's attempt to recast her desire to be compensated in line with her peers as a complaint based on gender is unavailing since there is

nothing in her communications with the Defendants that would have put them on notice that

Plaintiff believed gender-based discrimination was occurring.  *See Talwar*, 2014 WL 5784626,

at * 9 (citing *Ramos v. City of N.Y.*, No. 96-cv-3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22,

1997)); *see also McHenry v. One Beacon Ins., Co.*, No. 03-cv-4916, 2005 U.S. Dist. LEXIS

46573, at *18 (E.D.N.Y. Aug. 29, 2005)(granting defendants summary judgment where

plaintiff's complaints "were not articulated as gender-based discrimination but only as unfair,"

and plaintiff's "generalized complaint" that she was "unfairly paid less than her counterpart

Senior Trial Attorney" did not "reasonably put defendants on notice of a statutory claim");

*Kassman v. KPMG LLP*, 925 F. Supp.2d 453, 472-73 (S.D.N.Y. 2013) ("to satisfy the first prong

of the test for a prima facie claim of retaliation, 'a complaint must be sufficiently clear and

detailed for a reasonable employer to understand it, in light of both content and context, as an

assertion of rights protected by the statute and a call for their protection'" (quoting *Kasten v.

Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14, 131 S. Ct. 1325, 1335) (2011));

*Gilderhus v. Concentrix Corp.*, 825 F. Supp.2d 414, 431-32 (W.D.N.Y. 2011)(finding plaintiff

did not engage in protected activity because in her communications with the employer she "gave

no indication that she was complaining of discrimination").  Hence, since, on the present record,

Plaintiff has not established the threshold prerequisite of demonstrating engagement in a

protected activity, she cannot make out a *prima facie* case of retaliation; therefore, no rationale

factfinder could find in Plaintiff favor on her retaliation claims based on gender.

### ii.  Pregnancy-Based Claims

Plaintiff has not advanced any arguments in support of her pregnancy retaliation claims.

(*See* SAC at ¶¶163-65, 168-69.)

> Where, as here, a counseled non-moving party submits "a partial
> response arguing that summary judgment should be denied as to

> some claims while not mentioning others," that response "may be
> deemed an abandonment of the unmentioned claims." *Jackson v.
> Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014). Even "[w]here
> abandonment by a counseled party is not explicit," a court may
> infer abandonment "from the papers and circumstances viewed as
> a whole." *Id.* at 196.

*Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016). This case is similar to the *Camarda*

case, with the circumstances and papers fairly supporting an inference of Plaintiff's

abandonment of her pregnancy-based retaliation claims.

> Specifically, after responding to each of [D]efendants' proposed
> undisputed facts, [Plaintiff's] opposition brief argued only that
> summary judgment should be denied as to her discrimination
> claims [and her gender-based retaliation claims]. *See id.*
> (upholding inference of abandonment where plaintiff fully
> responded to defendant's proposed undisputed facts and opposition
> brief argued against grant of summary judgment only as to one
> claim); *accord Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834
> F.3d 128, 144 (2d Cir. 2016)(upholding inference of abandonment
> when party moved for summary judgment on all claims and non-
> moving party opposed motion with respect to all but one variety of
> claim).

*Id.* Accordingly, the Court considers Plaintiff's pregnancy-based retaliation claims abandoned.

### (b.) CPSIA

Plaintiff contents that her complaints regarding the lack of staff coverage for Wagner's

position, in particular, his function covering product safety, was tantamount to protected

whistleblower activity under the CPSIA. (*See* Opposition at 21-22.) She argues she had a

reasonable belief that the Company was breaching its CPSIA obligations, which belief, she puts

forth, was shared by the Company as evidenced by statements in Reinhold's April 9th Email (*see

id.* at 21.[10]), *to wit*: "If you feel a need to have a substantive conversation or other

communication with the Leeds or the outside directors let Eric Lerner and me know in advance.

---

[10] Plaintiff cites to paragraph 191 of her Rule 56.1 Counterstatement; however, that paragraph
does not support her argument. It appears Plaintiff meant to cite to paragraph 190.

*This does not mean your direct access to them is limited with regard to whistleblower type matters*."  (Ex. 32 (emphasis added).)

While recognizing that proving engagement in whistleblower "protected activity" requires both a subjective and objective showing of a reasonable belief that a violation has occurred or is occurring (*see* Opposition at 22), Plaintiff addresses only the subjective component of that showing, ignoring the objective portion of the analysis.  (*See id.* ("[S]he had a subjective belief that the complained-of conduct constitute[d] a violation of relative law [*i.e.*, the CPSIA]."); *see also id.* at 21-22.)  *See also, e.g., Sylvester v. Parexel Int'l LLC*, ALJ Nos. 2007-SOX-039, 2007-SOX-042, 2011 WL 2165854, at *11-12 (Dep't of Labor Adm. Rev. Bd. May 25, 2011)(in context of whistleblower action under Sarbanes-Oxley Act,[11] instructing that in determining subjective reasonableness, "the plaintiff's particular educational background and sophistication [is] relevant" and in determining objective reasonableness, the plaintiff's belief "is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience" (citations omitted)).

Defendants counter that the CPSIA does not have any direct application to Plaintiff's alleged protected activity since one portion of the Act (relating to "Children's Product Safety") is not implicated and the other portion (relating to "Consumer Product Safety Commission Reform") does not impose direct staffing requirements on companies.  (*See* Defs.' Reply at 13; *see also id.* at 14 (citing 15 U.S.C. § 2051. *et seq.* in support of position that CPSIA has no staffing requirements, *e.g.*, employment of a compliance officer or compensation requirements).)

---

[11]  Defendants advance "borrow[ing] from the standards utilized by the courts in interpreting another Federal anti-retaliation statute," *i.e.*, the Sarbane-Oxley Act (the "SOX"), because of the "scant case law" available regarding the interpretation of the CPSIA's anti-retaliation provision. (Def. Memo. at 20-21.)  By her citation to *Sylvester* (*see* Opposition at 22), Plaintiff conveys her agreement to that approach.  The Court find Defendants' suggested reliance on SOX anti-retaliation cases appropriate here.

"Therefore, on its face, Plaintiff could not have had a reasonable belief that Systemax was in violation of CPSIA." (Defs.' Reply at 13.) On the record presented, the Court agrees.

As Defendants state:

> The only reasonable, objective reading of [Plaintiff's] "complaint" [*i.e.*, the March 29th Email] is that an employee responsible for product compliance left the [C]ompany and had not been replaced as of the date of the e-mail. Plaintiff acknowledged that she had been authorized to hire a replacement for the position but she claimed that the salary she was authorized to pay was insufficient. She did not claim that Systemax was purposefully violating any statute or that it was not taking steps to provide staffing for product safety. The only issue Plaintiff was bringing to the attention of her employer was that, in her opinion, $70,000 was insufficient to hire a suitable candidate.

(*Id.*) Notably, this alleged whistleblower complaint was located under the "Tools/Resources" section of Plaintiff's March 29th Email, buttressing Defendants' argument that Plaintiff's complaint regarding product compliance was always about staffing within her department. (*See also, e.g.*, Pl.'s Depo Tr. at 206:5-13 (acknowledging approval for two hires at junior levels "for the same salary that Bob Wagner made").) Neither Plaintiff's March 29th Email nor subsequent emails (*see e.g.*, Ex. 35 (June 19, 2013 email chain between Plaintiff and Lerner)) relate definitively and specifically to the subject matter of the CPSIA, the statute under which Plaintiff seeks whistleblower protection. *See, e.g., Allen v. Admin. Review Bd. (Dep't of Labor)*, 514 F.3d 468, 477 5th Cir. 2008) ("[A]n employee's protected communications must relate definitively and specifically to the subject matter of the particular statute under which protection is afforded." (citing *Platone v. FLYI, Inc.*, ARB No. 04-154, ALJ No. 2003-SOX-27, 2006 WL 3246910, at *8 (Dep't of Labor Adm. Rev. Bd. Sept. 29, 2006)).

Indeed, the instant record supports the conclusion that a reasonable person in Plaintiff's position as the head of Systemax's Risk Management Department would not believe, either

subjectively or objectively, that the temporary vacancy in the product compliance position previously held by Wagner constituted a violation of CPSIA. Relatedly, no reasonable person in Plaintiff's position would believe, either subjectively or objectively, that the March 29th Email provided the Company with "information relating to any violation of, or any act or omission . . . reasonably believe[d] to be a violation of any provision of" the CPSIA. *See* 15 U.S.C. §2087(a)(1). Moreover, since the Plaintiff has not advanced, and the record cannot support a finding of, an argument supporting an objectively reasonable belief that Systemax was violating the CPSIA, Plaintiff has failed to establish the first prong of her CPSIA retaliation *prima facie* case. Accordingly, no rational factfinder could find in her favor as to that claim.

Even if that were not so, to the extent Plaintiff offers a subjectively reasonable belief[12] regarding a violation of CPSIA, that position is undermined by her own, earlier suggestion that the Company "<u>could go bare</u> *or require an operational individual to self manage this exposure.*" (Ex. 36 at 103 (italicized emphasis in original, underlined emphasis added).) From the context of this October 2012 email to Reinhold, it was clear that Plaintiff's concern with "going bare" was its potential negative implications regarding the Company's insurance coverage:

> *Also, various coverage lines expected to have a designated point person for safety and product issues (per our disclosures during the UW [i.e., underwriting] process). This would need to be mitigated and discussed with carriers. The Product Recall carrier would likely not renew with us without a program in place and a point person to address recall issues and product complaints as they come in.*

(*See id.* (emphasis in original).) Once Wagner left Systemax, it appears Plaintiff's concern with being "bare" shifted to the burden that vacancy placed on her Department. (*See* Ex. 35 (June 19,

---

[12] It is noteworthy that, although Plaintiff recognizes the "reasonable belief" component of engaging in protected activity requires a dual subjective and objective showing (*see* Opposition at 22 (citing *Sylvester v. Parexel Int'l LLC*, 2011 WL 2165854, at *11 (A.R.B. May 25, 2011)(*en banc*)), Plaintiff fails to make any such distinction in advancing her "reasonable belief" arguments. (*See id.*)

2013 (04:59 PM) email from Plaintiff to Lerner ("We have been trying to piece together compliance without any resource after [Wagner] left. . . . I have advised product compliance has been bare since [Wagner's] absence, which is why I continue to raise it, ask for support and resources. . . . I am trying to also bring Stan up to spend [*sic*], but training doesn't happen overnight."); *see also id.* June 19, 2013 (4:34 PM) email from Plaintiff to Lerner ("After [Wagner] left, there was no one *to manage* the function and since then, we have been trying to piece it together. This is why I have repeatedly asked for resources as we can *have someone dedicated tracking this internally*. It is critical, which is why I raised it." (Emphasis added.)).) Even if it were not ideal, there was some product compliance coverage. Significantly, Plaintiff testified that at the time of her March 29th Email, the whistleblower communication, Systemax had already hired someone to fill in for Wagner. (*See* Pl.'s Depo. Tr. at 200:13-23.) Thus, notwithstanding Plaintiff's characterization that not having Wagner's position staffed was "critical", the record belies Plaintiff's supposed subjective belief that a CPSIA violation was occurring. On the record presented, Plaintiff's subjective belief was not reasonable, and she did not engage in a protected activity when she communicated her concerns about "going bare" regarding product compliance.

V.     Conclusion

Accordingly, IT IS ORDERED that Defendants' Summary Judgment Motion is GRANTED; Plaintiff's SAC is dismissed in its entirety and with prejudice. The Clerk of Court is directed to enter Judgment in Defendants' favor and, thereafter, close this case.

SO ORDERED this 9th day of March 2018 at Central Islip, New York.

/s/ Sandra J. Feuerstein
Sandra J. Feuerstein
United States District Judge